[No. 48039–7. En Banc. December 16, 1982.]

JACK NOEL, *Plaintiff*, v. BERT L. COLE, *as Commissioner*, ET AL, *Appellants*, ALPINE EXCAVATING, INC., *Respondent*.

*Kenneth O. Eikenberry, Attorney General,* and *James R. Johnston, Assistant,* for appellants.

*Sam Peach, Ted D. Zylstra,* and *Zylstra, Beeksma & Waller,* for respondent.

UTTER, J.—The Commissioner of Public Lands and the Department of Natural Resources (DNR) entered into a contract with Alpine Excavating, Inc. (Alpine) by which DNR granted Alpine the right to cut timber from a tract of land on Whidbey Island. Local citizens brought an action seeking to enjoin the sale (Noel action) and Alpine thereupon filed a cross claim against DNR for breach of contract. The trial court held for the plaintiffs in the Noel action, enjoined all logging and found DNR liable for breach, awarding Alpine $1,043,413.61 in damages. From this judgment, DNR appeals. We reverse, holding that DNR's contract with Alpine was ultra vires and therefore unenforceable.

In 1977, DNR and the University of Washington, for whom DNR holds the tract in question in trust, decided to sell the logging rights by sealed bid pursuant to RCW 79.01.200. On May 23, 1977, bids were opened and Alpine was declared the apparent high bidder, at which time it paid a 10 percent deposit of $157,874.54. By letter of June 3, the Commissioner mailed a bill of sale to Alpine and on July 21, after Alpine put up a performance guaranty of $100,000, the parties executed a formal contract.

In reliance upon certain regulations (WAC 197–10–170(19)(a); WAC 197–10–175(4)(g)) exempting most timber sales from the State Environmental Policy Act of 1971 (SEPA), DNR did not prepare an Environmental Impact Statement (EIS). Alpine was unaware of this fact at the time of the auction and remained so until June 6 when it was served as a codefendant in the Noel action. At that time, it expressed concern to DNR about the validity of the sale, but DNR assured Alpine that the Noel action was frivolous and that logging could begin soon. DNR also contended that the contract could be enforced against Alpine if Alpine sought to avoid it. In light of these assertions and the fact that it had already made a deposit, Alpine treated

the contract as valid and began construction of a logging road in August.

On August 12, 1977, however, the plaintiffs in the Noel action obtained a temporary restraining order against construction of the road and on October 5 obtained a preliminary injunction. On January 3, 1979, the trial court permanently enjoined further logging absent preparation of an EIS. It held that the regulations relied upon by DNR were invalid and found that the sale to Alpine was a major action which would have a significant effect on the quality of the environment. The parties agree that this permanent injunction terminated their contract.

Alpine's cross claim against DNR was bifurcated from the Noel action and tried separately in June 1981. The trial court found DNR liable for breach of contract and awarded Alpine over a million dollars in damages.

## I

■ Historically, the unauthorized contracts of both corporate and governmental entities, which by their nature represent the interests of groups of individuals, have been rendered void and unenforceable under the ultra vires doctrine. *See, e.g., Millett v. Mackie Mill Co.,* 193 Wash. 477, 483, 76 P.2d 311 (1938); *Green v. Okanogan Cy.,* 60 Wash. 309, 319, 111 P. 226 (1910). The rationale for the rule is the protection of those unsuspecting individuals whom the entity represents.

> To adopt a rule that would not allow the *ultra vires* defense, would endanger the investments and savings of thousands of large and small investors who either own stock or bonds of a corporation. Such a rule would leave it in the power of managers or officers of large and small corporations to destroy the business of such corporations by making improvident contracts contrary to the business for which they were incorporated.

*Millett v. Mackie Mill Co., supra.* Similarly, the doctrine applies to governmental action to "protect the citizens and taxpayers . . . from unjust, ill-considered, or extortionate contracts, or those showing favoritism". 10 E. McQuillin,

*Municipal Corporations* § 29.02, at 200 (3d ed. 1981).

In the corporate sphere, the ultra vires doctrine has come under increasing disfavor. *See generally* H. Henn, *Corporations* 353 (2d ed. 1970). Critics have long argued that "business men cannot be expected to read and construe the charters of corporations before each contract is made." Ballantine, *Proposed Revision of the Ultra Vires Doctrine,* 12 Cornell L.Q. 453, 458 (1927). In response to this criticism, the Legislature statutorily eliminated the ultra vires defense in this state in 1965. RCW 23A.08.040.

In actions against governmental entities, however, the doctrine retains its vitality. *See Edwards v. Renton,* 67 Wn.2d 598, 602, 409 P.2d 153, 33 A.L.R.3d 1154 (1965). Unlike a corporate shareholder, who may choose the corporate bodies in which she invests and withdraw her investment at will, a citizen and taxpayer has only one government in which to "invest" and may not withdraw except by death or expatriation. In addition, private parties dealing with a government agency are charged with knowledge of the agency's authority. *State ex rel. Bain v. Clallam Cy. Bd. of Cy. Comm'rs,* 77 Wn.2d 542, 549, 463 P.2d 617 (1970). Such an imputation of knowledge of private corporate charters, in contrast, is unjustified. Ballantine, *supra.* For both of these reasons, the ultra vires doctrine is properly applied to government contracts.

■ An agency may lack authority to make a contract for a multitude of reasons. It may simply lack *any* power to contract in the government's name. More commonly, an agency steps outside its authority by failure to comply with statutorily mandated procedures. One such set of procedures is that provided by SEPA. It *requires* an EIS prior to any major action significantly affecting the environment. *Stempel v. Department of Water Resources,* 82 Wn.2d 109, 119, 508 P.2d 166 (1973). Thus, an agency has no authority to undertake such an action until it has prepared an EIS.

While the vast majority of governmental ultra vires cases have dealt with government purchases in violation of spending guidelines (*see State v. O'Connell,* 83 Wn.2d 797,

825–26, 523 P.2d .872 (1974) and cases cited therein), the doctrine is equally applicable where authority is lacking due to failure to comply with SEPA. One of the central purposes of SEPA is to "insure that presently unquantified environmental amenities and values will be given appropriate consideration in decision making". RCW 43.21C-.030(2)(b). It is intended to prevent action which is "ill–considered" (E. McQuillin, *supra*) from an environmental perspective. The ultra vires doctrine is just as necessary to prevent ill considered environmental action as it is to prevent ill considered financial action.[1]

In the instant case, there is no question that DNR has general authority to sell timber on land held in trust for educational purposes (*see* RCW 79.01.094) and that such sales may be by sealed bid (*see* RCW 79.01.200). DNR did, however, fail to prepare a required EIS. The parties have conceded, both before this court and by their failure to appeal the trial court's decision in the Noel action, that the regulations exempting timber sales from SEPA are invalid as applied to this case. As a result, they concede that DNR is required to prepare an EIS prior to any sale which is a major action significantly affecting the environment.[2] The

---

[1]*State v. Brannan,* 85 Wn.2d 64, 530 P.2d 322 (1975) is not to the contrary. In that case, this court held that petitioners could not collaterally attack an action based on an insufficient EIS as void. *Brannan,* at 71–74. Petitioners were barred from making an attack not because the government action was not ultra vires (an issue neither addressed nor decided in *Brannan*) but because, as parties who had participated in the original hearing and not appealed (*Brannan,* at 70), they were barred by laches. *Brannan,* at 74. Similarly, DNR, had it not properly appealed here, would have been barred from asserting at some later time that the judgment against it was invalid.

[2]We therefore need not address these issues in detail. We do note, however, that the regulations relied upon by DNR, if not subjected to a narrowing construction, are overbroad. WAC 197–10–175(4)(g) purports to exempt all timber sales from SEPA. WAC 222–16–050 defines all harvesting of timber, with minor exceptions not applicable here, as a class 3 forest practice, which SEPA itself exempts from the EIS requirement. RCW 43.21C.037. While SEPA does authorize the promulgation of administrative exemptions, they are limited to actions which are not major actions significantly affecting the quality of the environment. *See* RCW 43.21C.037; RCW 43.21C.110(1)(a). SEPA cannot be construed to allow the

trial court found that the sale in the instant case was such an action and therefore that DNR was required to prepare an EIS. Since it did not do so, the contract of sale to Alpine was ultra vires and Alpine cannot recover for any alleged breach.

## II

■■ There remains, however, a question of whether Alpine is entitled to some recovery to compensate it for the losses it has suffered on this project. While the ultra vires doctrine prevents a governmental agency from favoring a private entity at the expense of the public interest, it does not leave the unsuspecting private party entirely at the mercy of governmental misfeasance. Under certain conditions, a private party acting in good faith is entitled to some recovery. First, the agency must have had the power it sought to exercise but merely have exercised it in an irregular manner or by unauthorized procedural means.[3] *Finch v. Matthews*, 74 Wn.2d 161, 172, 443 P.2d 833 (1968). Second, the action must not be malum in se, malum prohibitum, or manifestly against public policy. *Finch*, at 175; *Edwards v. Renton, supra* at 604. If these two conditions are satisfied, a private party acting in good faith may recover to the extent necessary to prevent "manifest injustice" or unjust enrichment. *Finch*, at 175; *Edwards*, at 603–04.

---

creation of general exemptions which apply regardless of environmental effect, for this would permit administrative agencies to gut the statutes. *Cf. In re George*, 90 Wn.2d 90, 97, 579 P.2d 354 (1978) ("administrative agency may not, by interpretation, amend or alter the statutes under which it functions"). At the least, administratively created exemptions must be construed to apply only when the particular action in question is not a major action significantly affecting the environment. *See Downtown Traffic Planning Comm. v. Royer*, 26 Wn. App. 156, 164–65, 612 P.2d 430 (1980). We need not decide here whether these regulations may be saved by such construction since the trial court found in any event that the instant sale was a major action which would significantly affect the environment.

[3]The distinction between procedural irregularity and a substantive lack of authority is justified by the fact that in the latter case, the agency lacks the power to do the act in *any* manner. Where authority is so completely lacking it seems fair to presume bad faith on the part of the private party.

As noted above, DNR had the general authority to sell the timber rights in question to Alpine. Its failure to comply with SEPA was merely a failure to comply with a procedural, albeit important, requirement. The act does not dictate "[t]he particular choice ultimately arrived at" (*Eastlake Comm'ty Coun. v. Roanoke Assocs., Inc.,* 82 Wn.2d 475, 497, 513 P.2d 36 (1973)) and that choice is subject to judicial review only to the extent that it is "clearly erroneous" (*Polygon Corp. v. Seattle,* 90 Wn.2d 59, 69, 578 P.2d 1309 (1978)). Thus, DNR did not lack substantive authority to make this sale, but merely carried it out in an unauthorized procedural manner by failing to comply with statutory prerequisites.

Neither can we say that DNR's action was malum in se, malum prohibitum, or manifestly against public policy. While SEPA mandates important policy goals, DNR's failure to prepare an EIS was excusable in light of the regulations it relied upon.[4]

Finally, there is no evidence here of bad faith on the part of Alpine. Indeed, it was not even aware of the absence of an EIS until it had already paid a 10 percent deposit. Even after the Noel action was filed, DNR continued to assure Alpine that the contract was valid and that Alpine would soon be logging. In addition, it indicated it would attempt to enforce the contract if Alpine did not perform. Under these circumstances, we cannot say that Alpine acted in bad faith.[5]

In sum, Alpine is entitled to recover under a theory of unjust enrichment. The proper measure of its recovery is the reasonable value of its improvement to the tract in question, namely its partial road construction, less any profits from the timber removed. *State v. O'Connell, supra*

---

[4] In addition to the fact that the regulations on their face exempted almost all timber sales, DNR had relied upon the regulations in making numerous past sales, none of which had been challenged.

[5] Had it done so, even recovery for unjust enrichment might be denied, as we have suggested in the past. *See Edwards v. Renton, supra* at 606.

at 825–26 and cases cited therein. Where, as here, the party seeking recovery is not at fault, reasonable value is measured by the amount which the benefit conferred would have cost the defendant had it obtained the benefit from some other person in the plaintiff's position. Restatement (Second) of Contracts § 371, comment *b* (1981); 12 S. Williston, *Contracts* § 1485 (3d ed. 1970). This amount is to be distinguished from cost and might be either more or less,[6] though cost is some evidence of value. S. Williston, at § 1483; *Edwards,* at 607.

In the instant case, therefore, remand is necessary so that Alpine may prove the reasonable value of its road construction. Because the amount of this recovery for unjust enrichment is not liquidated, interest on it may not be had until final judgment. *Edwards v. Renton, supra.* Alpine may, however, recover interest at the legal rate for the time during which DNR held its deposit and performance guaranty.[7] Since the contract was void at its purported inception, Alpine was entitled to immediate restitution of these amounts and, since they were liquidated, interest began to run on them immediately upon the accrual of Alpine's right to the funds. *See, e.g., Vermette v. Andersen,* 16 Wn. App. 466, 472, 558 P.2d 258 (1976) (interest begins to run on date of rescission).

The judgment is reversed. The cause is remanded to the trial court for the introduction of such further evidence as

---

[6] In general, a court should not limit maximum recovery to cost as was directed in *Edwards,* at 607. That limitation was justified there because the statute violated was a bidding statute intended to bind contractors to their bids. Comment, *Quasi–Contractual Recovery When Municipal Contract Ultra Vires,* 41 Wash. L. Rev. 569, 572–73 (1966). Other cases applying the rule described in *Edwards* in the face of different statutory violations have set no such limit. *See, e.g., Jones v. Centralia,* 157 Wash. 194, 221–22, 289 P. 3 (1930).

[7] The performance guaranty consisted of an assignment by Alpine to DNR of a bank account in the former's name. It is unclear from the record whether interest was earned on this account and, if so, which party received it. If interest was received by Alpine, the judgment should be adjusted accordingly.

384

necessary and computation of damages as set forth above.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, DOLLIVER, WILLIAMS, DORE, DIMMICK, and PEARSON, JJ., concur.

Reconsideration denied March 1, 1983.