[No. 29611-6-I.   Division One.   May 3, 1993.]

SNOHOMISH COUNTY, ET AL, *Appellants,* v. THE STATE OF WASHINGTON, ET AL, *Respondents,* FOREST PRACTICES APPEALS BOARD, *Appellant.*

*Seth R. Dawson, Prosecuting Attorney,* and *Edward E. Level* and *Traci M. Goodwin, Deputies; Christine O. Gregoire, Attorney General,* and *Richard A. Heath, Senior Assistant; Michael W. Gendler* and *Bricklin & Gendler,* for appellants.

*Christine O. Gregoire, Attorney General,* and *Kathryn L. Gerla, Jennifer Barnett, Patricia H. O'Brien,* and *Fronda C. Woods, Assistants; William F. Lenihan, James F. McAteer,* and *Schwabe, Williamson & Wyatt; Bartholomew G. Irwin* and *Platt, Irwin, Colley, Oliver & Wood; Mark S. Clark* and *Hillis Clark Martin & Peterson,* for respondents.

SCHOLFIELD, J. — Snohomish County and the Washington Environmental Council (WEC) appeal a superior court decision affirming a Forest Practices Appeals Board (Appeals Board) order upholding logging permits issued by the Department of Natural Resources (DNR) to TAT (USA) Corporation and Golden Spring International, Inc. (GSI). The appellants contend that DNR violated the State Environmental Policy Act of 1971 (SEPA), RCW 43.21C, in issuing the permits. The Appeals Board seeks review of the Superior Court's decision that it had no jurisdiction to declare invalid rules promulgated by the Forest Practices Board (FPB) under the Forest Practices Act of 1974 (FPA). We affirm.

FACTS

In early May 1989, TAT and GSI applied to DNR for permits to clear-cut a total of 1,575 acres in the Lake Roesiger

and Woods Creek watersheds in Snohomish County. Pursuant to WAC 222-16-050, DNR determined that the applications involved class III forest practices and were therefore exempt under the FPA and SEPA from the requirements for preparation of an environmental impact statement (EIS). Having so classified the applications, DNR did not evaluate whether or not a detailed statement must be prepared pursuant to SEPA.

Pursuant to DNR procedures prescribed for class III applications, DNR utilized the principles of the Timber-Fish-Wildlife (TFW) agreement to identify "priority" issues. An "ID team" of persons with various technical backgrounds was assembled to advise DNR on the applications' priority issues. On May 18, 1989, the team, along with 20 observers, visited the sites involved in the applications. They then prepared a written report and submitted it to DNR on May 24, 1989.

GSI and TAT owned approximately 4,575 acres of merchantable second growth timber in the involved area, and there was uncertainty as to whether TAT and GSI intended to apply for permits to cut more timber later on. At the request of DNR, public meetings were held in which the companies discussed their future logging plans. At those meetings, each of the companies announced its intention to log all merchantable timber on the properties within 2 years.

On June 19, 1989, DNR approved the companies' applications with conditions, including deletion of the area within the Lake Roesiger basin. This meant that all lands draining toward the lake were excluded from DNR's approval. However, this deletion was made without prejudice to any future reapplications. The approvals comprised 930 acres, approximately 20 percent of the companies' holdings in the area.

Snohomish County brought an action against DNR and the companies in Thurston County Superior Court. The court granted a temporary restraining order on June 29, 1989. On July 10, 1989, the County filed an appeal with the Appeals Board, and on July 20, 1989, the Superior Court

dismissed the action, deferring to the primary jurisdiction of the Appeals Board.

The Appeals Board hearings were held over 13 days in September 1989, and the issues addressed concerned the effect of the proposed logging on wetlands, streams and fisheries, wildlife, county roads, and fire danger.

The Appeals Board concluded it had jurisdiction to decide the validity of WAC 222-16-050, a rule adopted by the FPB to be used in classifying applications for forest practices permits. The Appeals Board held the rule impermissibly overbroad because it permitted forest practices with potential for substantial environmental impact (class IV) to be designated class III practices, thus exempting them from the SEPA requirements. Class IV forest practices included practices which have a potential for a substantial impact on the environment, and therefore required an evaluation by DNR as to whether or not an EIS must be prepared. RCW 76.09-.050; RCW 43.21C.037(3).

Notwithstanding the Appeals Board's conclusion that DNR had improperly relied upon an invalid rule in approving the permits, the Appeals Board held that the particular forest practices at issue did not have a potential for a substantial environmental impact and were properly designated class III. The Appeals Board concluded that DNR properly considered the cumulative effect of past and proposed forest practices, but held that DNR was not required to consider the effects of future, unproposed forest practices for which applications had not been filed. The Appeals Board also concluded that the TFW process is consistent with SEPA and can properly be used by DNR in determining whether an application has a potential for a substantial environmental impact.

The Appeals Board decision was appealed to Snohomish County Superior Court, which affirmed the Appeals Board decision approving the permits, but ruled that the Appeals Board did not have jurisdiction to declare WAC 222-16-050

invalid. Nevertheless, the court agreed that WAC 222-16-050 was invalid for the reasons addressed by the Appeals Board. The court found that all of the Appeals Board's findings of fact were supported by substantial evidence. The Appeals Board was made a party and moved for reconsideration of the court's decision as to its jurisdiction. All motions for reconsideration were denied.

The Superior Court refused to stay any part of its order. The permits were issued to TAT and GSI. The permits expired on June 19, 1990, by which time the entire timber harvest had been completed, including harvesting of timber on lands not involved in this appeal. No merchantable timber is left to harvest on the 4,575 acres.

## MOOTNESS

TAT contends this appeal is moot because the permits have expired, the timber has been harvested, and it is no longer possible for the court to provide the relief sought, which was the invalidation of the permits. All other parties that briefed the issue urge the court to address significant issues raised in this case which they assert involve matters of continuing and substantial public interest.

A case is technically moot if the court cannot provide the basic relief originally sought, *In re Swanson*, 115 Wn.2d 21, 24, 804 P.2d 1 (1990), or can no longer provide effective relief. *In re Cross*, 99 Wn.2d 373, 376-77, 662 P.2d 828 (1983). In determining whether or not a sufficient public interest is involved, a court should consider:

> (1) the public or private nature of the question presented; (2) the desirability of an authoritative determination which will provide future guidance to public officers; and (3) the likelihood that the question will recur.

*In re Swanson, supra* at 25 (quoting *Dunner v. McLaughlin*, 100 Wn.2d 832, 838, 676 P.2d 444 (1984)).

Here, despite the private ownership of the land, the legal questions appealed raise concerns of a public nature involving the environmental effects on fish, wildlife, fire danger, water quality, and aesthetics. Without future guidance, the

question of the Appeals Board's jurisdiction to determine a rule invalid is likely to recur, as are questions of SEPA's application to procedures under the FPA. The parties are genuinely adverse, and their advocacy is of high quality.

We find the criteria under *Dunner* to be met, and this court shall rule on the legal issues presented. Factual issues, however, such as whether findings of fact regarding wetlands, county roads, and fire danger are supported by the record, do not meet the *Dunner* criteria; they do not involve matters of continuing and substantial public interest because those factual issues relate only to this particular case. Furthermore, we decline to address issues of cumulative effect of past and future applications because new regulations on cumulative effects were filed January 8, 1992, effective February 8, 1992, thus making it unlikely that the same issues involving the prior regulations will recur.

### APPEALS BOARD'S STANDING TO APPEAL

The Appeals Board was created by RCW 76.09.210; its powers and jurisdiction are delineated in RCW 76.09.220. It has exclusive jurisdiction to hear appeals arising from any DNR determination. RCW 76.09.220(7). Judicial review of decisions of the Appeals Board is governed by the Administrative Procedure Act (APA), RCW 34.05. RCW 76.09.230(4).

Under the APA, a party to judicial review is "[a] person named as a party . . . or allowed to participate as a party in a judicial review . . .." RCW 34.05.010(12)(b). The definition of "person" includes any governmental subdivision or public organization of any character. RCW 34.05.010(13). Here, the Appeals Board was named as a party and was allowed to participate in the superior court proceedings. It thus appears that under the APA, the Appeals Board qualifies as a party.

RAP 3.1 requires that an appealing party be "aggrieved". Likewise, under the APA an "aggrieved party" may secure appellate review of any final judgment of the superior court. RCW 34.05.526. The Appeals Board cites cases in which various state agencies were considered to be "aggrieved parties", beginning with *In re Foy*, 10 Wn.2d 317, 321-22, 116 P.2d 545

(1941). In *Foy* at page 325, the court allowed the commissioner of unemployment compensation and placement to bring before the Superior Court a question which otherwise might never have been raised "to the great prejudice of the public."

Citing *Foy*, *Rauch v. Fisher*, 39 Wn. App. 910, 696 P.2d 623 (1985) found that the Department of Retirement Systems Director was an aggrieved party within the meaning of the APA because the Superior Court had reversed a decision to disallow retirement benefits. This is analogous to the present case, in which the Superior Court reversed the Appeals Board's decision that it had jurisdiction to determine the validity of WAC 222-16-050. It appears from *Rauch* that the Appeals Board is an aggrieved party which may seek appellate review.

This result is supported by *Snohomish Cy. v. Hinds*, 61 Wn. App. 371, 810 P.2d 84 (1991), in which this court determined it was proper to include the Snohomish County Boundary Review Board as a party to an appeal, because otherwise it would be possible to have a party appealing the board decision without any opposing party. "Such a circumstance would deprive an appellate court of an adversarial presentation of arguments, as well as be manifestly unfair to [the] review board that could not defend its decision . . .." *Hinds*, at 377.

TAT argues that the Appeals Board should not act as an advocate in cases in which it serves a quasi-judicial function. However, here the Appeals Board is not attempting to act as an advocate of a particular outcome, but rather, is challenging a ruling affecting its jurisdiction. Compare *Valley & S. R.R. v. Laudahl*, 296 Or. 779, 681 P.2d 109 (1984). Consequently, based on the relevant statutes and policy considerations favoring full presentation of issues, we hold that the Appeals Board has standing in this case.

## WEC's STANDING

TAT argues that WEC does not have standing because the permits involve private tree farms, and "[t]he trees belong to TAT". Brief of Respondent TAT, at 30. TAT's argument

against WEC's standing is not well grounded in fact nor supported by citation of authority. A number of WEC members have homes located on Lake Roesiger, and WEC is concerned about the effects of clear-cutting on water quality, erosion, fisheries, and fire hazard. The FPA declares as its purposes the "protection to forest soils, fisheries, wildlife, water quantity and quality, air quality, recreation, and scenic beauty." RCW 76.09.010(1). These are the same values WEC seeks to protect. The fact that the timber is owned by a private company does not prevent WEC members from having an interest, any more than it prevents the State from protecting its statutorily conferred interest. *Department of Natural Resources v. Marr*, 54 Wn. App. 589, 593, 774 P.2d 1260 (1989) ("The FPA regulates forest practices on public and private forest lands.").

WEC has standing.

APPEALS BOARD JURISDICTION TO REVIEW VALIDITY
OF ADMINISTRATIVE RULES

The FPB and the Department of Ecology (DOE) assert that the Appeals Board has neither express nor implied authority to pass judgment on the validity of rules promulgated by the FPB.

As an agency created by statute, the Appeals Board has only those powers expressly granted or necessarily implied from the statute. *Anderson, Leech & Morse, Inc. v. State Liquor Control Bd.*, 89 Wn.2d 688, 694, 575 P.2d 221 (1978). It is undisputed that the superior court is granted the authority by the APA to review the validity of rules. RCW 34.05-.570(2)(a) provides that "[a] rule may be reviewed by petition for declaratory judgment . . . or in the context of any other review proceeding under this section." There is no similar express grant of authority to the Appeals Board, nor does any party contend that there is.

If the Legislature intends to expressly grant rule review authority to a quasi-judicial agency, it may do so, as it did, for example, in RCW 90.58.180(4), granting the Shorelines Hearings Board the power to review rules of DOE. Because the

Legislature has the authority to grant the power to review rules, but did not grant such power to the Appeals Board, there is a clear implication that the Legislature did not intend to grant the Appeals Board authority to declare a rule invalid. There is case authority supporting this view.

In *Seattle v. Department of Ecology*, 37 Wn. App. 819, 683 P.2d 244 (1984), the court determined that the Pollution Control Hearings Board did not have jurisdiction to determine the validity of rules promulgated by DOE. The court held that only superior courts have jurisdiction under the APA to issue declaratory judgments on the validity of rules, and there was no reason to infer that the Board had any such review authority.

The Appeals Board argues that RCW 34.04.570(2)(a) provides a clear invitation to parties to raise rule validity issues with the Board.

> A rule may be reviewed . . . in the context of any other review proceeding under this section. In an action challenging the validity of a rule, the agency shall be made a party to the proceeding.

RCW 34.04.570(2)(a).

The Appeals Board's argument that RCW 34.04.570(2)(a) is an implied grant of jurisdictional power is unpersuasive. RCW 34.04.570 is concerned with review of agency action by a *court*, not review of a rule's validity by another agency. *Seattle v. Department of Ecology, supra*, was decided upon the same basis that we rely upon here in holding that the Appeals Board does not have rule review authority.

### Standard of Review

In their briefs, the parties express some disagreement over the applicable standards of review in this case.

■■ In an appeal from a judicial review of an administrative decision, the appellate court applies the appropriate standard of review directly to the administrative record. *Franz v. Department of Empl. Sec.*, 43 Wn. App. 753, 756, 719 P.2d 597, *review denied*, 106 Wn.2d 1013 (1986). Factual determinations are reversed only if there is a firm conviction

that a mistake has been made, and a legal conclusion based on established facts is reviewed only for an error of law.

We have found this case to be moot insofar as factual issues are concerned. The remaining issues to be resolved on this appeal involve matters of continuing and substantial public interest where only legal questions are at issue. The issue is thus whether the Appeals Board erred as a matter of law.

## DOES SEPA APPLY TO CLASS III
### FOREST PRACTICES?

The County and WEC contend that SEPA requires DNR to evaluate independently each forest practices application to determine whether the proposed practice has a potential for a substantial environmental impact.

■ In Washington, forest practices on nonfederal lands are governed by two acts, the FPA and SEPA. In the FPA, the Legislature permitted certain classes of forest practices to be exempt from EIS requirements. In enacting the FPA, the Legislature declared:

> [T]he forest land resources are among the most valuable of all resources in the state; that a viable forest products industry is of prime importance to the state's economy; that it is in the public interest for public and private commercial forest lands to be managed consistent with sound policies of natural resource protection[, including] forest soils, fisheries, wildlife, water quantity and quality, air quality, recreation, and scenic beauty.

RCW 76.09.010(1). "[T]he Legislature's intent in enacting the FPA was to foster the commercial timber industry while protecting the environment." *Department of Natural Resources v. Marr*, 54 Wn. App. 589, 593, 774 P.2d 1260 (1989). To implement these goals, the FPA established a 3-part regulatory system. The FPB promulgates forest practices rules (WAC Title 222) to carry out the policies of the FPA. RCW 76.09-.040. DNR administers and enforces the rules of the FPB and DOE, but does not have rule-making authority with respect to forest practices. RCW 76.09.040(1). The Appeals Board hears appeals arising from actions of DNR under the FPA. RCW 76.09.220(7).

The FPA specifically delegates to the FPB the task of establishing by rule which forest practices to include within each of four classes based on their potential for environmental impact. These classes are first delineated by statute. RCW 76.09.050(1). Class I forest practices are those with "no direct potential for damaging a public resource"; class II are those with "less than ordinary potential for damaging a public resource"; class III are those not included in classes I, II or IV. Classes I, II and III are exempt from the requirements to prepare an EIS. RCW 76.09.050(1).

Class IV forest practices include those practices "which have a potential for a substantial impact on the environment and therefore require an evaluation by [DNR] as to whether or not" an EIS must be prepared. RCW 76.09.050(1)(d); RCW 43.21C.037(3). An EIS may not be required if the action is one that is "categorically exempt under RCW 43.21C.110-(1)(a)". RCW 43.21C.031. If not otherwise exempt, an EIS "shall be prepared on . . . major actions having a probable significant, adverse environmental impact." RCW 43.21C-.031.

In the present case, DNR classified the permit applications by referring to WAC 222-16-050, in which a forest practice is within class IV if any of five conditions exist (including, for example, use of pesticides, where a species is endangered, or in slide areas). Since none of those five conditions existed, DNR concluded the forest practice at issue was in class III. However, the Appeals Board and the Superior Court ruled WAC 222-16-050 invalid because the five categories for class IV were unduly restrictive — that is, conditions other than those listed could present a potential for a substantial impact on the environment, thus bringing the forest practice into class IV. No party challenges the conclusion that the rule is invalid.

Snohomish County and WEC argue that SEPA requires DNR to independently evaluate each forest practices application at an early stage to determine whether the proposed action has the potential for a substantial environmental

impact. In making this argument in spite of statutory provisions to the contrary, the appellants rely on *Noel v. Cole*, 98 Wn.2d 375, 655 P.2d 245 (1982) and *Downtown Traffic Planning Comm. v. Royer*, 26 Wn. App. 156, 612 P.2d 430 (1980).

In *Noel*, the parties conceded on appeal that the forest practices regulation exempting timber sales from SEPA was invalid as applied in that case. Even though the validity of the rule was not at issue in the case, in a footnote the Supreme Court discussed the nature of SEPA exemptions and determined that those exemptions must be limited to actions which were not major actions significantly affecting the environment:

> While SEPA does authorize the promulgation of administrative exemptions, they are limited to actions which are not major actions significantly affecting the quality of the environment. . . . SEPA cannot be construed to allow the creation of general exemptions which apply regardless of environmental effect, for this would permit administrative agencies to gut the statutes.

*Noel*, at 380 n.2.

Similarly, in *Downtown Traffic Planning Comm. v. Royer, supra*, the court determined that guidelines establishing categorical exemptions from SEPA are not final determinations of whether a project must comply with SEPA.

█ DNR responds to the argument based on *Noel* and *Downtown Traffic* by stressing that subsequent to the filing of those cases, the Legislature adopted amendments intended to allow DNR to rely on rules classifying forest practices without making a separate determination as to whether SEPA procedures must be followed. We are persuaded by DNR's argument that the legislative amendments following *Noel* and *Downtown Traffic* render those cases no longer authoritative on this issue. When *Noel* and *Downtown Traffic* were decided, RCW 43.21C.110 directed that the Council on Environmental Policy adopt guidelines for implementing SEPA. Arguably, the rules regarding SEPA exemptions were to serve merely as guidelines. The implication in *Noel* that DNR could not rely merely on such guidelines in exempting forest prac-

tices was consistent with SEPA at that time, which did not have well-delineated mandatory statutory exemptions.

RCW 43.21C.110 was amended in 1983 mandating DOE to adopt rules and guidelines for implementing SEPA, including categories of governmental actions

> which are not to be considered as potential major actions significantly affecting the quality of the environment . . . The rules shall provide for certain circumstances where actions which potentially are categorically exempt require environmental review.

RCW 43.21C.110(1)(a).

Accordingly, SEPA rule WAC 197-11-800(25)(a), promulgated in 1984, states that class I, II, and III forest practices are categorically exempt from threshold determinations and EIS requirements, subject to the limitations under WAC 197-11-305.[1] Categorical exemptions are limited under WAC 197-11-305(1) for any proposal where cumulative effects are involved. The Legislature also enacted RCW 43.21C.031, which requires preparation of EIS's for major actions having probable significant adverse environmental impacts, with the exception of the categorical exemptions. We agree with DNR that these changes to the statute give DOE the responsibility to classify which actions are exempt so the other agencies may rely upon the rules that DOE adopts.

SEPA and its amendments present a statutory scheme in which uniform rules are established to identify actions gen-

---

[1] Categorical exemptions are limited under WAC 197-11-305(1) for any proposal which is a segment of a proposal that includes

(i) A series of actions, physically or functionally related to each other, some of which are categorically exempt and some of which are not; or

(ii) A series of exempt actions that are physically or functionally related to each other, and that together may have a probable significant adverse environmental impact in the judgment of an agency with jurisdiction. . . .

The limitations of these exemptions are important. The Appeals Board noted that forest practices exemptions from SEPA must be made with regard to environmental significance. The Appeals Board also concluded that "The terms of SEPA's forest practices exemption [include] the limitation that forest practices with a potential for a substantial impact on the environment require an evaluation as to whether or not a detailed statement must be prepared pursuant to SEPA." Conclusion of law (Appeals Board) 17.

erally exempt from SEPA without the necessity of further review. To require DNR to fully apply SEPA to the process of classifying each forest practice application would render SEPA's categorical exemptions meaningless.[2] The FPA also directs the FPB to establish by rule those practices which fall into each classification, and both the FPA and SEPA exempt class I, II, and III forest practices, as defined by rule of the FPB, from preparation of an EIS. RCW 76.09.050; RCW 43.21C.037(1). We hold that the Legislature's exemption of class III forest practices from SEPA spares DNR (and the parties) from individual case-by-case environmental review. The Legislature intended to prevent unnecessary paperwork, delays, and bureaucratic processing that would be a significant burden on government and taxpayers. It is noteworthy in this regard that in 1988, DNR processed over 8,000 forest practices permits.

The Legislature has placed the responsibility on DNR to reasonably apply the categorical exemptions of SEPA, while recognizing that the exemptions from SEPA are limited under WAC 197-11-305(1). For classes I, II, and III, the Legislature did not intend for DNR to comply with all the procedural steps necessary to determine if an EIS is required. The contention of the County and WEC that SEPA applies to all forest practices applications is rejected. SEPA's EIS requirements do not apply to the first three classes of forest practices, unless by operation of WAC 197-11-305(1).

Snohomish County also argues that the legislative exemptions for the first three classes of forest practices exempt only the preparation of a final EIS, but that DNR is still required to prepare environmental checklists, threshold determinations, and draft EIS's.

This argument is not persuasive. RCW 76.09.050(1)(d) exempts class III forest practices "from the requirements for

---

[2]*See also* WAC 197-11-305(2), which states:

"An agency is not required to document that a proposal is categorically exempt. Agencies may note on an application that a proposal is categorically exempt or place such a determination in agency files."

preparation of a detailed statement" under SEPA. Environmental checklists are prepared to assist a lead agency in making a threshold determination (WAC 197-11-315(1)(a); WAC 197-11-330), at which point the agency determines whether an EIS is required. Because class III forest practices are generally exempt from preparation of an EIS, it logically follows that no intermediate steps need be taken. The only exception to this would lie in the possible application of WAC 197-11-305(1) to a particular application.

The County also argues that DNR improperly substituted procedures developed under the TFW agreement for SEPA procedures. Under that agreement, DNR identifies "priority issues" associated with class III applications and initiates interdisciplinary assessment of the applications. Because class III applications are generally not subject to SEPA procedures, this process does not violate SEPA requirements.

Judgment affirmed.

WEBSTER, C.J., and BAKER, J., concur.

Reconsideration denied July 1, 1993.

Review denied at 123 Wn.2d 1003 (1994).