[No. 43092-1-I.  Division One.  February 14, 2000.]

PLUM CREEK TIMBER COMPANY, L.P., *Appellant,* v. THE WASHINGTON STATE FOREST PRACTICES APPEALS BOARD, ET AL., *Respondents.*

*John W. Hempelmann* and *Brian L. Holtzclaw* of *Cairn-cross & Hempelmann, P.S.*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Cheryl A.*

582

*Nielson, Maia D. Bellon, Patricia H. O'Brien*, and *Jean Marie Wilkinson, Assistants*; and *Peter Robert Goldman* of the *Washington Forest Law Center*, for respondents.

APPELWICK, J. — This case presents the issue of whether WAC 197-11-305 (Section 305) can apply to require State Environmental Protection Act (SEPA) review for otherwise SEPA-exempt discrete Class III forest practices, when those practices are individual segments of a larger proposal that has a potential for a substantial impact on the environment. Plum Creek Timber Company and the Alpine Lakes Protection Society (ALPS) appeal from a superior court judgment affirming the Forest Practices Appeals Board's (FPAB's) conclusion that Section 305 can apply to Class III forest practices, and reversing the FPAB's conclusion that Plum Creek's proposed road project would not have a probable significant adverse impact to recreation and aesthetics. In its cross appeal, ALPS contests the superior court's denial of attorney fees under the Equal Access to Justice Act (EAJA). Reviewing the FPAB's decision de novo, we affirm the FPAB's interpretation of Section 305 and reinstate its conclusion that Plum Creek's road proposal would have no significant adverse impact to recreation and aesthetics. We also affirm the trial court's decision not to award attorney fees.

## REGULATORY BACKGROUND

The Forest Practices Act, RCW 76.09, is designed to " 'foster the commercial timber industry while protecting the environment.' " *Snohomish County v. State*, 69 Wn. App. 655, 665, 850 P.2d 546 (1993) (quoting *Department of*

*Natural Resources v. Marr*, 54 Wn. App. 589, 593, 774 P.2d 1260 (1989)). The Forest Practices Act authorizes the Forest Practices Board (FPB) to adopt forest practice rules, and to the extent that the rules relate to water quality, the Department of Ecology (Ecology) must also promulgate these rules. RCW 76.09.040. The Department of Natural Resources (DNR) administers and enforces the forest practice rules. RCW 76.09.040. The FPAB hears appeals arising from DNR's actions under the act. RCW 76.09-.220(7).

The Forest Practices Act provides for four classes of forest practices, Class I, II, III, and IV. RCW 76.09.050(1). Class IV forest practices include those that have a "potential for a substantial impact on the environment." RCW 76.09.050(1). Generally, only Class IV forest practices receive review under the State Environmental Policy Act. RCW 76.09.050(1). SEPA review requires an agency or local jurisdiction to make a "threshold determination" as to whether a proposed "action" is likely to result in probable significant adverse environmental impacts, requiring preparation of an Environmental Impact Statement (EIS). WAC 197-11-310, -330 and -360. The FPB determines, by rule, which forest practices are Class IV and therefore subject to SEPA. *Snohomish County*, 69 Wn. App. at 666; RCW 76.09-.050(1).

In addition, the Legislature directed Ecology to specify, by rule, particular "[c]ategories of governmental actions which are not to be considered as potential major actions significantly affecting the quality of the environment." RCW 43.21C.110(1)(a). The Legislature provided that those "categorical exemptions" are to be "limited to those types which are not major actions significantly affecting the quality of the environment." RCW 43.21C.110(1)(a). But the Legislature also directed that those rules "shall provide for certain circumstances where actions which potentially are categorically exempt require environmental review." RCW 43.21C.110(1)(a).

Pursuant to these mandates, Ecology adopted the SEPA

rules. Ch. 197-11 WAC. The FPB, in turn, adopted all of the SEPA rules by reference, except "those rules that may not be applicable." WAC 222-10-050.

Under the SEPA rules, a "categorical exemption" is an "action, . . . which does not significantly affect the environment." WAC 197-11-720. Consistent with the Legislature's directive to "provide for certain circumstances where actions which potentially are categorically exempt require environmental review," Ecology adopted WAC 197-11-305, which provides in relevant part:

(1) If a proposal fits within any of the provisions in Part Nine of these rules [the categorical exemptions], the proposal shall be categorically exempt from threshold determination requirements (WAC 197-11-720) *except* as follows:

. . .

(b) The proposal is a segment of a proposal that includes:

. . .

(ii) A series of exempt actions that are physically or functionally related to each other, and that together may have a probable significant adverse environmental impact in the judgment of an agency with jurisdiction.

In other words, in order for an otherwise potentially SEPA-exempt forest practice to be brought into SEPA by operation of Section 305, two distinct circumstances must occur. First, the proposed forest practice must be a segment of a proposal. Second, the proposal as a whole must be one that may have a probable significant adverse environmental impact.

In 1992, the FPB adopted the watershed analysis rules, ch. 222-22 WAC, as a subset of the forest practice rules. Watershed analysis is a method to address the cumulative effects of forest practices on the public resources of water, fish, and capital improvements of the state or its political subdivisions. WAC 222-22-010(1). Watershed analysis results in special "prescriptions" to protect and restore

those three public resources. WAC 222-22-010(1). The FPB determined that if the prescriptions are used, certain forest practices which would otherwise have a potential for a substantial impact on the environment (and therefore be a Class IV-Special subject to SEPA) would no longer have such an impact. *See* WAC 222-16-050(1)(d), (e), (f), (h).

## FACTS OF THIS CASE

This case involves a forest practices permit that DNR issued to Plum Creek in 1996 for a road in the Scatter Creek basin area of Kittitas County. Plum Creek made an earlier attempt to build a road on its Scatter Creek parcel by submitting a forest practices application in 1992. DNR approved that first application as a Class III SEPA-exempt permit. The Alpine Lakes Protection Society (ALPS) appealed, and the FPAB overturned the approval. The FPAB, concerned about slope stability, held that the application should have been classified as a Class IV-Special, subject to SEPA review.

Instead of immediately submitting another application for the same road project, Plum Creek prepared a watershed analysis and revised the road proposal. ALPS appealed DNR's approval of Plum Creek's watershed analysis. The FPAB affirmed DNR's decision, but a superior court reversed it. This court then decided the case, in a published opinion at *Alpine Lakes Protection Society v. Department of Natural Resources*, 102 Wn. App. 1, 979 P.2d 929 (1999) (*Alpine Lakes* II).

Meanwhile, Plum Creek submitted another road project proposal in 1996. In reviewing the application, DNR considered both the road proposal actually applied for and Plum Creek's conceptual future harvest plans. DNR again approved the application as a Class III, non-SEPA permit.

ALPS appealed DNR's approval to the FPAB. The FPAB reached the merits of only ALPS's argument that the DNR should have conducted SEPA review of the Scatter Creek application by operation of Section 305. Plum Creek moved

to dismiss, arguing that SEPA review was not required because Class III forest practices are exempt from SEPA by statute and Section 305, an administrative regulation, does not apply. The FPAB disagreed, concluding that Section 305 can, in those situations to which it applies, work to bring under SEPA review otherwise SEPA-exempt Class III forest practices. The FPAB also ruled, however, that where a watershed analysis has been approved, Section 305 may require SEPA review only for elements of the environment other than water, fish and capital improvements.[1] The FPAB also ruled that Plum Creek's proposed road was a segment of a larger proposal under Section 305, thus requiring an assessment as to whether the proposal would have a probable significant adverse impact on grizzly bears, recreation and aesthetics so as to bring under SEPA review this Class III SEPA-exempt permit.

The parties then proceeded with a hearing on the merits. Following the hearing, the FPAB affirmed the DNR's approval of the Scatter Creek application as a Class III forest practice without SEPA review. The FPAB concluded that there would not be probable significant adverse impacts to recreation, aesthetics or grizzly bears.

Both Plum Creek and ALPS appealed the FPAB's decisions to superior court. Plum Creek appealed that portion of the FPAB's order containing the conclusion that Section 305 may apply in appropriate circumstances to require SEPA review of otherwise SEPA-exempt Class III forest practices. ALPS appealed the FPAB's final decision from the hearing on the merits. The superior court affirmed the FPAB's order involving the interpretation and application of Section 305. The court also affirmed the FPAB's findings and conclusions of no impacts to grizzly bears. But the superior court reversed the FPAB's final decision regarding alleged impacts to recreation and aesthetics. The superior court remanded the Scatter Creek application for a SEPA threshold determination. The court also denied ALPS's request for attorney fees under the EAJA.

---

[1]This latter aspect of the FPAB decision is not at issue in the present appeal.

Plum Creek now appeals the superior court's final decision and requests that this court: (1) reverse that decision and the FPAB's order regarding the application of Section 305 to Class III forest practices; and, if the court concludes that Section 305 applies to Class III forest practices, (2) affirm the FPAB's final conclusion of no impacts to recreation and aesthetics. In a cross-appeal, ALPS requests this court to reverse the lower court's denial of attorney fees under the EAJA.[2]

## THIS COURT'S OPINION IN ALPINE LAKES II

*Alpine Lakes* II concerned Plum Creek's Alps Watershed Analysis for the Alps Watershed administrative unit. The Alps Watershed unit contains the Scatter Creek area where Plum Creek hopes to build a road. The FPAB had ruled by summary judgment that an EIS for the watershed analysis was not required because approval of the watershed analysis, in and of itself, would have no probable significant adverse environmental impact. We reversed.

Upon approval of a watershed analysis, Class IV forest practices that would otherwise require threshold SEPA review to determine whether an EIS must be prepared are effectively reduced to the level of Class III practices and are exempt from SEPA review by virtue of the watershed

---

[2]ALPS submitted a Notice of Supplemental Authority before this court, citing two cases it had not included in its briefs. ALPS included in the notice not only the names of the cases but also parenthetical explanations of their holdings, as well as an explanation of how one of the cases relates to the present appeal. DNR filed a motion to strike ALPS's notice of supplemental authority; Plum Creek moved to join that motion.

Parties may file a statement of additional authorities prior to the filing of a decision on the merits. RAP 10.8. The statement of additional authorities must be filed "without argument," but may include a short comment indicating the portion of the brief or argument to which the authorities pertain. RAP 10.8; 3 LEWIS H. ORLAND & KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE 313, cmt. (5th ed. 1998). Here, DNR is correct that ALPS improperly presented argument in its statement of additional authorities. Nonetheless, we denied DNR's motion to strike, reasoning that DNR was not disadvantaged because it presented a substantive response to ALPS's improper argument.

analysis. Therefore, we concluded, any future Class IV forest practices that would otherwise require threshold SEPA analysis should not be ignored in the process of deciding whether to approve a watershed analysis by which those same practices would become exempt from SEPA. We remanded the case to the FPAB to determine whether an EIS was required after considering Plum Creek's future, albeit as yet unproposed, forest practices.

On remand of *Alpine Lakes* II, the FPAB must evaluate the possible adverse environmental effects of Plum Creek's road proposal and possible future timber harvests, in determining whether an EIS is required for the watershed analysis. But the FPAB need evaluate only any possible environmental effects upon water, fish and capital improvements. Thus, *Alpine Lakes* II does not affect the present lawsuit, in which the impacts on aesthetics and recreation are at issue.

## STANDARD OF REVIEW

■ The superior court reviewed the FPAB's decisions in this case pursuant to the Administrative Procedures Act (APA), RCW 34.05.514, as authorized by RCW 76.09.230. We do not review the superior court's final decision. Instead, we review the FPAB's decision de novo and apply the APA standards of review directly to the administrative record before the FPAB. *See King County v. Boundary Review Bd.*, 122 Wn.2d 648, 672, 860 P.2d 1024 (1993).

■ The APA standards of review applicable to this case provide that we may overturn the FPAB's decision only if "[t]he agency has erroneously interpreted or applied the law" or "[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court." RCW 34.05.570(3)(d), (e). We accord substantial weight to the agency's legal interpretation to the extent that it falls within the agency's expertise in a special area of the law. *Superior Asphalt & Concrete Co. v. Department*

*of Labor & Indus.*, 84 Wn. App. 401, 405, 929 P.2d 1120 (1996). But the "ultimate authority" to interpret a statute rests with this court. *Waste Management of Seattle, Inc. v. Utilities & Transp. Comm'n*, 123 Wn.2d 621, 627-28, 869 P.2d 1034 (1994).

## SECTION 305 ISSUE

A.  The Application of Section 305 to Class III Forest Practices

Plum Creek argues that, under RCW 76.09.050(1) and 43.21C.037(1), Class I, II, and III forest practices are exempt from SEPA review regardless of their environmental impact, and that Section 305 cannot limit these "statutory SEPA exemptions." Instead, Plum Creek contends, Section 305 applies only to the administrative categorical exemptions that are defined under the SEPA rules.

In *Snohomish County v. State*, 69 Wn. App. 655, 668-69, 850 P.2d 546 (1993), we held that Class III forest practices are generally exempt from SEPA without further environmental review. Yet we also noted that SEPA exemptions are limited under Section 305, and that SEPA's EIS requirements could apply to the first three classes of forest practices by operation of Section 305. *Snohomish County*, 69 Wn. App. at 668-69. Plum Creek now requests that we reexamine and clarify our holding in *Snohomish County*, arguing that we "did not address the significant distinction between statutory SEPA exemptions and administrative categorical exemptions" in that case.

■ Contrary to Plum Creek's argument, the law does not clearly distinguish between statutory exemptions and administrative categorical exemptions, at least as far as the application of Section 305 is concerned. First, Section 305 is not limited on its face to "administrative categorical exemptions." Section 305 applies by its own terms to "the provisions in Part Nine" of the SEPA rules. WAC 197-11--305(1). Part Nine is encaptioned "Categorical Exemptions" and provides: "The proposed actions contained in

Part Nine are categorically exempt from threshold determination and EIS requirements, subject to the rules and limitations on categorical exemptions contained in [Section 305]." WAC 197-11-800. Part Nine then lists several types of actions that are "categorically exempt." WAC 197-11-800(1)-(27). That list includes "Class I, II, III forest practices as defined by RCW 76.09.050." WAC 197-11-800(25)(a). Thus, under the plain language of the SEPA rules, the "statutory exemptions" are a subset of the "categorical exemptions," and are subject to the limitations of Section 305.

Second, the "statutory" exemptions in RCW 76.09.050(1) and RCW 43.21C.037(1) for Class I, II and III forest practices are unlike other statutory SEPA exemptions. The Legislature delegated to the FPB the authority to establish by rule which of these forest practices should be included in Classes I, II, III and IV, based on the statutory parameters set forth in RCW 76.09.050(1). Since the FPB has authority to adopt rules classifying forest practices, rules providing for exceptions to those classifications are consistent with the FPB's authority. Again, the FPB adopted the SEPA rules by reference, except "those rules that may not be applicable." WAC 222-10-050.

Under RCW 76.09.050(1), Class III consists of those practices not in Class I, II or IV. Class IV includes practices that have a potential for a substantial impact on the environment. Section 305 expressly recognizes that actions that are "physically or functionally related to each other," but which would be exempt if evaluated in isolation, are subject to SEPA review if together they "may have a probable significant adverse environmental impact." WAC 197-11-305(1)(b)(ii). Thus, the relevant issue is not whether statutory and categorical exemptions are significantly distinct, but whether Section 305 can apply to require connected actions review of segmented SEPA-exempt forest practice permits. The limitation of Section 305 on forest practices exemptions is consistent with the legislative directive in RCW 76.09.050(1) that forest practices with a potential for

a substantial environmental impact be subject to SEPA review.

Finally, Plum Creek relies on *Dioxin/Organochlorine Center v. Pollution Control Hearings Board*, 131 Wn.2d 345, 932 P.2d 158 (1997), in support of its argument that administrative and statutory categorical exemptions are significantly distinct. But *Dioxin* is distinguishable from the present case. *Dioxin* involved an administrative categorical exemption for a single discharge permit; the present case, in contrast, involves a segmented permit. We affirm the FPAB's interpretation and application of Section 305.

B. Recreational and Aesthetic Impact

The next issue is whether the FPAB correctly concluded that the Scatter Creek project would not have a probable, significant adverse impact upon recreation or aesthetics.

█ A reviewing court may overturn the FPAB's decision regarding no significant environmental impact if the order "is not supported by evidence that is substantial when viewed in light of the whole record before the court." RCW 34.05.570(3)(e). "Substantial evidence is said to exist if there is sufficient evidence to persuade a fair-minded, rational person of the truth of the declared premise." *Beeson v. Atlantic-Richfield Co.*, 88 Wn.2d 499, 503, 563 P.2d 822 (1997).

Under SEPA, "[s]ignificant" means "a reasonable likelihood of more than a moderate adverse impact on environmental quality." WAC 197-11-794(1). "Significance involves context and intensity . . . . Intensity depends on the magnitude and duration of an impact." WAC 197-11-794(2). Further, the SEPA rules require a consideration of measures to "mitigat[e]" the impacts of an action. WAC 197-11-330(1)(c).

1. Recreation

In finding that the Scatter Creek application would not have a probable, significant adverse impact upon recreation, the FPAB considered several factors. The FPAB noted that Plum Creek has an "open lands" policy on its

Scatter Creek parcel, and that Plum Creek's decision to allow the Forest Service to maintain a trail on its land was revocable and discretionary. The FPAB also found that the Scatter Creek parcel is seldom used by recreationalists, and that those who do use it are seeking lands in their natural state. The FPAB found that those recreationalists who chose not to return to the Scatter Creek land after Plum Creek began harvesting timber there, would find an abundance of land in its natural state within the adjacent Alpine Lakes Wilderness Area. Further, the FPAB found that more people are likely to use the site for recreation after a road and harvest, due to the increase in accessibility. Thus, the FPAB concluded that the probable result would be to shift recreational use from one user group to another, while increasing recreational use and enjoyment overall. Finally, the FPAB found that any impact to recreation would be mitigated. From these findings, the FPAB concluded that there would not be a probable, significant adverse impact upon recreation.

In reaching its conclusion, the FPAB appropriately considered the "context" of the Scatter Creek property. The FPAB noted that the Scatter Creek property is private land designated for commercial timber production, and that Plum Creek has the right to revoke the public's ability to recreate there. Plum Creek is not obligated to protect recreation. The FPAB also considered the uniqueness of the Scatter Creek property, acknowledging that it is currently roadless and adjacent to the Alpine Lakes Wilderness Area.

The record also supports the FPAB's conclusion that impacts to recreation were not significant in terms of their "intensity." The Scatter Creek application will adversely impact only a "discrete subset of the population" who currently recreate on the Scatter Creek parcel. According to the record, the Scatter Creek property is seldom used and only by a subset of recreationalists. Ed Henderson, a member of the Mountaineers, testified that the area did not receive a great deal of use, and that those who use

Scatter Creek are drawn there because they enjoy an un-roaded, backcountry experience. Dr. Alan Wagar, ALPS's own recreation expert, testified that those who enjoy such backcountry solitude represent only a "subset" of the population.

The record does not support the superior court's finding that those who have not recreated in Scatter Creek will have an adverse reaction to forest practice activities there. Dr. Wagar acknowledged that many individuals enjoy hiking in other areas of the Cascade Mountains which contain forest practices, including logging roads and clear cuts. He also acknowledged that overall recreational use of Scatter Creek would likely increase because construction of a logging road would make it more accessible. The Scatter Creek trail will continue to be maintained for public use. Thus, the record supports the FPAB's finding that the "discrete subset" of recreationalists currently using Scatter Creek would be the group primarily impacted by the Scatter Creek application.

The record also supports the FPAB's conclusion that those who choose not to return to Scatter Creek would find an abundance of land in its natural state within the Alpine Lakes Wilderness Area. The Alpine Lakes Wilderness Area is adjacent to Scatter Creek and provides thousands of acres of unroaded backcountry.

Finally, the FPAB appropriately considered factors that would mitigate the effect on recreation of forest practices in the Scatter Creek area. The SEPA rules define the term "mitigation" to include "[c]ompensating for the impact by replacing, enhancing, or providing substitute resources or environments." WAC 197-11-768(5). Here, the shift from one recreational user group to another demonstrates that the impact to the "discrete subset" of recreationalists currently using the area is mitigated by providing greater access to other groups of recreational users. Further, the FPAB found that the visibility of the road and future harvests from the Scatter Creek trail would be mitigated: the trail would remain primarily within the 200-foot buffer

of a riparian management zone, the number of times the trail crossed the road would be minimized, and future timber harvests on the Scatter Creek parcel would not be clearcuts. We have no reason to question these three findings.

In light of the FPAB's findings, which are supported by substantial evidence, the FPAB reasonably concluded that the probable impact of the Scatter Creek application and future timber harvests to recreation was not significant.

2. Aesthetics

In considering the impact of the Scatter Creek application on aesthetics, the FPAB made several findings. The FPAB found that the road and timber harvests on the Scatter Creek parcel would be visible from the adjacent public lands of the Alpine Lakes Wilderness Area, but that only a small portion of the views from the Wilderness Area would be affected. The FPAB also found that the "small and discrete subset" of the population that currently recreates on the Scatter Creek parcel have formed an expectation that it will always remain as it is today. The FPAB found that there would be an emotional reaction among this group if either road building or timber harvesting occurred. The FPAB concluded that this expectation was inconsistent with the designation of the parcel for long term commercial timber production. The FPAB further found that other recreationalists, who would use the site in greater numbers after road building and timber harvests, would not have that reaction. The FPAB concluded that the mere visibility of forest practices would not create a probable significant, adverse aesthetic impact.

Substantial evidence supports the FPAB's conclusion that the Scatter Creek application would not have a probable significant adverse impact on aesthetics. Again, the testimony indicated that recreational use of the Scatter Creek parcel would likely increase following the proposed forest practices there. This suggests that any impact to aesthetics would not significantly deter recreationalists from enjoying the area. Further, the adjacent Alpine Lakes

Wilderness is available for the small group of recreationalists who would be impacted by any adverse effect on aesthetics. We have no reason to question the FPAB's finding that the road and timber harvests would not be highly visible from the wilderness area. Finally, the Scatter Creek parcel is designated for timber harvests; Plum Creek is not obligated to prevent the impacts of its forest practices on aesthetics. In light of these factors, the FPAB reasonably concluded that the probable impact to aesthetics would not be significant.

## ATTORNEY FEES

In its cross-appeal, ALPS contends that the superior court should have awarded it attorney fees under the Equal Access to Justice Act (EAJA). The act grants attorney fees and costs, capped at $25,000, to the prevailing party in a judicial review of an agency action, unless the court finds that the agency action was substantially justified or the circumstances make the award unjust. RCW 4.84.350. ALPS argues that DNR's defense in superior court of the FPAB's decision was not substantially justified.

██ ██ Because the Washington EAJA is patterned after the federal act, this court has adopted the federal definition of "substantially justified." *Alpine Lakes Protection Soc'y v. Department of Natural Resources*, 102 Wn. App. at 19. Under federal law, "substantially justified" means justified in substance or in the main—in other words, justified to a degree that could satisfy a reasonable person. *Id.* (citing *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541, 101 L. Ed. 2d 490 (1988)). This court has also adopted the federal standard of review, which is abuse of discretion. *Id.* (citing *Pierce*, 487 U.S. at 565).

Here, the trial court denied ALPS's request for attorney fees under EAJA, concluding that DNR's position in the case was reasonable and therefore substantially justified because the case "involves the balancing of sensitive, sometimes competing or conflicting interests in a contro-

versial area and requires analysis of close questions on which there is no clear precedent on point."

The trial court's holding that DNR's actions were reasonable under the circumstances is supported by the record. The FPAB's decision required consideration of a complicated regulatory scheme as well as the subjective issue of aesthetics. No state appellate decisions address recreational and aesthetic impacts in the context of forest practices regulation. Finally, our decision here demonstrates our belief that the FPAB's conclusions were supported by substantial evidence. Thus, DNR's decision to defend the FPAB's conclusions was justified to a degree that could satisfy a reasonable person. The lower court did not abuse its discretion in declining to award attorney fees.

In conclusion, we affirm the FPAB's interpretation of Section 305; we reinstate the FPAB's finding of no significant impact to recreation and aesthetics; and we affirm the superior court's decision not to award attorney fees to ALPS.

AGID, A.C.J., and ELLINGTON, J., concur.