668

[No. 65077-7-I.   Division One.   November 7, 2011.]

MEGAN PELLINO, *on Behalf of Herself and All Others Similarly Situated, Respondent*, v. BRINK'S, INCORPORATED, *Appellant*.

*Timothy L. Ashcraft* (of *Williams Kastner & Gibbs*) (*Jeffrey W. Pagano* and *Ira M. Saxe* of *Crowell & Moring LLP*, of counsel), for appellant.

*Martin S. Garfinkel, Adam J. Berger,* and *Maria Lorena Gonzalez* (of *Schroeter Goldmark & Bender*), for respondent.

¶1 SCHINDLER, J. — In this class action lawsuit against Brink's Incorporated, messengers and drivers of armored trucks allege they did not receive meal periods or rest breaks in violation of the Washington industrial welfare act (IWA), chapter 49.12 RCW, and Washington Administrative Code (WAC) 296-126-092. Brink's appeals the judgment entered in favor of the class members and the trial court's "Findings of Fact, Conclusions of Law, and Order." Brink's asserts the trial court (1) abused its discretion in certifying the class action, (2) erred in interpreting the legal require-ments for meal periods and rest breaks, and (3) abused its discretion in relying on expert testimony. We affirm.

## FACTS

¶2 The findings of fact are not challenged on appeal. Brink's Incorporated provides armored vehicle security for transporting currency, negotiable instruments, and other valuables for its customers. Brink's employs a crew consist-ing of a driver and a messenger for each armored truck. Most new employees begin as drivers. The messenger is responsible for the currency and other valuables, which Brink's refers to as "liability," that are transported in the armored truck. The messenger and the driver carry a firearm.

¶3 Brink's management assigns a route to the driver and messenger for each armored truck. Typical duties for a route include delivering and picking up liability from banks, retail stores, and other customers; emptying and

restocking ATMs (automated teller machines); and at the end of the business day, delivering currency to a central bank vault, known as a "bank-out." The findings state:

> Some routes may specialize in a single activity, like serving ATMs. Some routes have two components separated by a return to the branch. For example, a route might involve customer pick-ups and deliveries in the morning and early afternoon, followed by either a bank-out or a series of "deposit pulls" from ATMs.

¶4 Drivers and messengers engage in work activities "before and after each armored vehicle run that are necessary and indispensable to the run." These activities include:

> "[B]uying" or checking out liability, keys, firearms, radios, and paperwork from the vault, pre-trip inspection of the truck, and loading liability and coins before the run, and "selling" liability back to the vault, and completing and returning paperwork at the end of the run. . . . Some class members also were assigned to "opening crew," requiring them to arrive at and secure the branch in the morning, after which they proceeded to work on armored vehicle runs.

¶5 Brink's management schedules a mandatory start time for each route. "Although routes do not have a mandatory completion time, branch management constructs the routes to fit within an estimated stop time," often mid to late afternoon. The findings state:

> Some customers have contracts that require their pick-ups to be deposited at the bank vault on the same day. In order to meet the bank-out, crews collecting cash that must be delivered to a bank at the end of the day must return to the branch by mid to late afternoon.

¶6 The "Daily Guide Sheet" lists the stops Brink's management schedules for the route, "including any special pick-ups or deliveries." The driver is expected to fill in the time of arrival and departure for each stop during the day on the Daily Guide Sheet, as well as the number of items delivered or picked up. "Some guide sheets also contain

notations on other stops made by crew members to refuel the truck, use the restroom, or eat, and some contain notations about events on the route, such as customer delays or traffic." Between stops, the messenger completes paperwork and prepares for the next stop. Messengers are also responsible for monitoring the crew's progress.

¶7 Brink's pays messengers and drivers for meal periods and rest breaks. Brink's posted a "Form 132" in the Seattle and Tacoma branch offices that describes "Working Conditions and Benefits." The section entitled "Break Periods" states:

> The security and operational rules and procedures applicable to Brink's employees assigned to work on armored vehicle crews and in other positions remain in effect at all times during such break periods.

¶8 The primary duty of the drivers and messengers is to guard and protect the valuables transported in the armored trucks. Brink's instructs drivers and messengers

> to continuously observe their surroundings for potential threats, to anticipate and "take every possible precaution" against possible attack, and to be constantly suspicious of other vehicles and pedestrians, even persons who appear to be police officers, store employers, or innocuous pedestrians.

The Brink's "Basic Blue Security Training" states:

> The act of guarding is a function to protect Brink's employees and other personnel and to safeguard Brink's property and the property of Brink's customers. It is the duty of all crew members to be alert for hazards that may endanger the security of fellow-employees and customer shipments.

The "Handbook for Brink's Personnel" states, in pertinent part:

> The primary duty of every armed Brink's employee is to act as a guard. That is, to enforce against employees and other persons, rules to protect the property of Brink's or its customers or to protect the safety of persons through the use of force up to and including deadly force.

The Handbook also states:

> Keep in mind the fact that you must not only be alert, you must look alert. Only in this way can you convince the criminal element that it would be foolhardy to attack your crew or premises.

¶9 Brink's prohibits drivers and messengers from engaging in any personal activities while on duty during the day. The Handbook states:

### 3.080 READING MATERIAL AND PERSONAL ITEMS

> Employees, while on duty, are forbidden to carry books, magazines, newspapers, personal radios, tape players, tape recorders, personal cell phones, personal pagers, personal computers, etc.

### 3.090 PERSONAL BUSINESS

> Making purchases, paying bills or engaging in any personal business is prohibited for any member of an armored vehicle crew while on duty.

¶10 On April 24, 2007, Megan Pellino filed a class action lawsuit against Brink's on behalf of herself and other class members who worked as a crew member for Brink's on armored trucks in the Seattle and Tacoma branches. The complaint alleged that Brink's willfully failed to provide the crew members rest and meal breaks in violation of the IWA; WAC 296-126-092; the Minimum Wage Act, chapter 49.48 RCW; and the wage rebate act, chapter 49.52 RCW.[1]

¶11 Pellino filed a motion for class certification under CR 23. Brink's opposed the motion. The trial court granted the motion for class certification. The order addresses numerosity, commonality, typicality, and adequacy of representation. The court defined the class and the time period as follows:

> [A]ll drivers and messengers who were employed by Brink's Incorporated in its Seattle or Tacoma branches during the class period of April 26, 2004 through October 31, 2007.

---

[1] Before trial, the plaintiffs dismissed the other claims for preshift work and unpaid overtime.

After notifying potential class members, the class consisted of 182 messengers and drivers who worked at Brink's from April 26, 2004 through October 31, 2007 in either the Seattle or the Tacoma branch.

¶12 Pellino filed a motion for summary judgment, asserting that Brink's failed to provide rest breaks and meal periods in violation of the requirements of state law. Pellino argued Brink's required drivers and messengers to actively work and remain vigilant during meal and rest breaks. Pellino also argued that the work demands while on the scheduled routes do not allow the drivers and messengers to take meal periods or rest breaks.

¶13 Brink's filed a cross motion for summary judgment, asserting that it had adopted rules for break procedures; that Brink's paid the drivers and messengers for the entire workday; that meal and rest breaks are a part of the schedule for the route; and that because the crew is in charge of the route, the driver and the messenger have the discretion to decide when to take breaks. The trial court denied the cross motions for summary judgment.

¶14 The 14-day bench trial began on November 9, 2009. Pellino argued that (1) class members did not receive "the requisite break time, because of the number of stops on the armored car runs and operational and security pressures to keep the trucks moving and complete the runs in a timely manner;" and (2) even if class members received meal periods and rest breaks, those breaks were "not legally sufficient[ ] because they were required to remain on active duty guarding the armored vehicle and its contents throughout any break."

¶15 Eight representative class members testified on behalf of the class. Four of the class members who testified worked in the Seattle branch, and the other four worked in the Tacoma branch. One of the witnesses, Michael Jaquish, had also worked as a part-time supervisor and trainer of new messengers and drivers. In addition, Dr. Robert Abbott presented statistical evidence based on his analysis of the

Daily Guide Sheets, and Dr. Jeffrey Munson, a database and data management expert, testified about the calculation of damages. At the conclusion of the case on behalf of the class members, the court denied Brink's motion to dismiss and decertify the class. In the case on behalf of Brink's, the defense introduced into evidence deposition excerpts from branch managers.

¶16 On January 7, 2010, the court ruled in favor of the class members. On March 9, the court entered "Findings of Fact, Conclusions of Law, and Order." The 55-page order contains 62 findings of fact and 75 conclusions of law.

¶17 The trial court found credible the testimony representative of the class members "that messengers and drivers are expected to carry out this primary job function of guarding at all times when they are out on their routes, including whenever they are using the bathroom, purchasing food, or eating," and that the testimony was corroborated by the deposition and documentary evidence admitted at trial. The findings state that Brink's required the messengers and drivers "to be vigilant and alert at all times and to guard the cash and other valuables entrusted to Brink's by its customers continuously while on their runs."

¶18 The court rejected Brink's argument that vigilance required only a "passive state." The court found the evidence established that the vigilance required by Brink's is "active observation and mental exertion at all times."

> Drivers and messengers are instructed to continuously observe their surroundings for potential threats, to anticipate and "take every possible precaution" against possible attack, and to be constantly suspicious of other vehicles and pedestrians, even persons who appear to be police officers, store employees, or innocuous pedestrians.

The findings state that in order to ensure constant vigilance, Brink's prohibits all personal activities when on the route, except eating, drinking, and smoking in the armored truck. The court cited the provisions in the Handbook as

corroborating evidence that crew members are forbidden from "engaging in any personal business" while on duty. The court states the evidence established violation of the Handbook is grounds for termination.

¶19 The trial court also rejected Brink's argument that vigilance is primarily for the benefit of the driver and the messenger. The court found that Brink's requires the crew to exercise vigilance to safeguard the currency, valuables, and property of the customers. Because the driver and the messenger must always remain vigilant, as well as perform a number of additional duties while on the route, the court found that crew members "were always engaged in active work duties when on the armored vehicles." Accordingly, "there is no time during a run when drivers and messengers can relax, engage in personal activities, or simply focus on eating."

¶20 Citing the credible and consistent testimony of the representative class members who testified, the court also found that regardless of the requirement to constantly remain vigilant, there was insufficient time to take breaks.

> [T]here was insufficient time for armored truck crew members to take meal periods and rest breaks and that management pushed crews to keep moving for security and business reasons. Class members were trained not to stop the vehicle for any longer than necessary in order to minimize its exposure as a target.

The findings also state that "[t]he length of the routes and the number of stops . . . precluded crews from taking rest stops or meal breaks," and Brink's trained the crews to stop the truck only long enough to complete the stop, both for security reasons and to "maintain the profitability of the branch." "The expectation was 12 stops per hour, approximately five minutes per stop." The evidence established that Brink's managers instructed crews not to stop the truck for breaks, but to "eat on the go." "Supervisors would check the progress of trucks throughout the day and urge

crews to hurry up to remain on schedule and meet the bank-out deadline."

> As a result of the operational and security practices . . . , drivers and messengers did not receive actual meal breaks, but ate while the truck was moving or, for drivers, during the brief periods while the messenger was making pick-ups or deliveries at a stop. . . . Crew members testified they never stopped the truck solely for the purpose of eating or resting. . . . Generally, truck crews also received no rest breaks other than occasionally running to the bathroom or grabbing food or drink to go at a stop along the route.

¶21 Taking into consideration the testimony of the Brink's managers that an extra 50-minute break time was included in the schedule for each route, the findings state that even if an extra 50 minutes were provided, because "of the need to remain vigilant," drivers and messengers could not take a break at the same time, and 50 minutes was not sufficient for the mandated breaks. The trial court found that "[t]he class members consistently testified that the total amount of time they generally spent on such bathroom or food stops was between three and ten minutes per day." To avoid "the negative consequences of returning late to the branch, truck crews were compelled to minimize the time spent" on taking breaks. Consequently, crew members "would not wait in line when purchasing food," and would only "use restrooms in easily accessible locations." A former branch manager testified that the "culture" of the company is to not take breaks.

¶22 The findings state that Dr. Abbott's analysis of the Daily Guide Sheets corroborated the absence of adequate rest and meal breaks and the duration of the stops. Statistical analysis shows the aggregate average of the duration of the recorded stops for meal periods and rest breaks each day was 8.3 minutes. The court accepted Dr. Abbott's testimony based on his statistical analysis of the Daily Guide Sheets. The court also cites to the testimony of a number of former branch managers who testified "that

crew members were instructed to record rest breaks and meal periods on the daily guide sheets for tracking and accountability purposes." The court also notes that "[t]his testimony is unrebutted."

¶23 The court concluded that Brink's violated the IWA and WAC 296-126-092 because class members were always "engaged in active work duties when on the armored vehicles."

> Class members in this case never received lawful breaks because they were always engaged in active work duties when on the armored vehicles, specifically, guarding and being vigilant (*e.g.*, scanning their routes and surrounding areas, being alert and giving the appearance of alertness, looking out of windows, and maintaining communications with fellow crew members when apart). Class members had to be on watch for attack at almost every moment of their workday and be expected to respond with deadly force.

Accordingly, the court concluded the drivers and messengers did not receive any break "from mental and physical exertion and no opportunity for personal relaxation, activities or choice."

> Even when crew members went to the bathroom, it was a hurried process. When they ate, they could not be outside the truck and could not have a real lunch break. Remaining on active guard duty throughout such "breaks" compromises the purpose of rest and meal periods, because there is no relief from mental or physical exertion and no opportunity for personal relaxation, activities or choice. Thus, any time class members spent going to the restroom or eating while working in the truck does not constitute lawful break time under Washington law.

¶24 Regardless of the requirement to actively guard and remain vigilant, the court also concluded that the evidence established Brink's engaged in a class-wide pattern or practice of failing to provide sufficient "rest and meal break minutes" during the workday.

The Court also concludes that Plaintiff has proven a classwide pattern or practice of failure to provide class members with sufficient rest and meal break minutes during their workdays, irrespective of the requirements of active guarding. This failure was the result of training, operational requirements and pressures imposed by Brink's management, including the length and number of stops on the routes, restrictions on stopping the truck for more than a few minutes at a time, and the pressure to meet bank-out deadlines.

. . . The Court is persuaded by a preponderance of the evidence that, almost all the time, the employees just did not take meal breaks or rest breaks, because they were so concerned about security and about finishing the route and getting back on time. If they did take a meal or rest break, it was interrupted and never concluded. The Court concludes that Plaintiff has proved this on a classwide basis, regardless of whether or not any burden-shifting is appropriate as applied under the FLSA (Fair Labor Standards Act) and set forth in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 90 L. Ed. 1515, 66 S. Ct. 1187 (1946).

¶25 The court entered a judgment in favor of the class members for $874,775.70 in back pay, $422,536.75 in prejudgment interest, and $799,155.98 in attorney fees and costs. Brink's appeals.

## ANALYSIS

¶26 Brink's contends the trial court (1) abused its discretion in certifying the class and denying the motion to decertify, (2) erred in interpreting the legal requirements for meal periods and rest breaks, and (3) abused its discretion by relying on the expert testimony.[2]

*Standard of Review*

¶27 Where the trial court has evaluated evidence, our review is limited to determining whether the findings

---

[2] We allowed Brink's to amend the opening brief and the reply brief to correctly cite to the record. In the amended briefs, Brink's improperly added to or modified the original citations. However, because Brink's does not challenge any of the trial court's findings of fact, we deny Pellino's motion to strike the amended briefs.

are supported by substantial evidence and, in turn, whether those findings support the conclusions of law. *Standing Rock Homeowners Ass'n v. Misich*, 106 Wn. App. 231, 242-43, 23 P.3d 520 (2001). We draw reasonable inferences from the facts in favor of the trial court's determination. *Henry v. Bitar*, 102 Wn. App. 137, 142, 5 P.3d 1277 (2000). Because Brink's does not assign error to any of the trial court's findings of fact, the findings of fact are verities on appeal. *Moreman v. Butcher*, 126 Wn.2d 36, 39, 891 P.2d 725 (1995). We review issues of law de novo. *Perry v. Costco Wholesale, Inc.*, 123 Wn. App. 783, 792, 98 P.3d 1264 (2004).

*Class Certification*

██ ██ ¶28 Brink's contends the trial court abused its discretion in certifying the class action and denying the motion to decertify. We review the decision to certify a class action for manifest abuse of discretion. *Lacey Nursing Ctr., Inc. v. Dep't of Revenue*, 128 Wn.2d 40, 47, 905 P.2d 338 (1995). We will uphold the trial court's decision if the record shows that the court considered the criteria for class certification, and the decision is based on tenable grounds and is not manifestly unreasonable. *Lacey Nursing Ctr.*, 128 Wn.2d at 47. A defendant may move for decertification at any point in the proceedings. *Oda v. State*, 111 Wn. App. 79, 91, 44 P.3d 8 (2002).

██ ¶29 In order to certify a class action under CR 23, the plaintiffs must show numerosity, commonality, typicality, and adequacy of representation. CR 23(a). Commonality is satisfied when the alleged facts indicate that the defendant was engaged in a " 'common course of conduct in relation to all potential class members.' " *Oda*, 111 Wn. App. at 89[3] (quoting *King v. Riveland*, 125 Wn.2d 500, 519, 886 P.2d 160 (1994)). Under CR 23(a)(2), the court must conclude "there are questions of law or fact common to the class." The court must also find that one of the alternatives

[3] (Internal quotation marks omitted.)

under CR 23(b) is met. Individual class members can present evidence to demonstrate a common course of conduct by the defendant. *Miller v. Farmer Bros.*, 115 Wn. App. 815, 825, 64 P.3d 49 (2003).

¶30 Brink's argues that the court abused its discretion in certifying the class because it did not have a "uniform rule or policy on breaks" and the drivers and messengers had the discretion to decide when to take breaks. Brink's asserts that because the decision of when to take breaks "varied from employee to employee," breaks were "characterized by a lack of uniformity"[4] and do not establish commonality under CR 23. As to commonality and whether the complaint alleged a "common course of conduct," the court concluded that "[t]he principal factual and legal issues are whether class members are entitled to compensation for . . . missed rest and meal breaks under Washington law." The court also concluded that the requirements of CR 23(b)(3) were met because questions of fact common to the members of the class predominated over questions affecting individual members, and a class action was superior to the other available means to fairly and efficiently adjudicate the controversy.

¶31 The record shows the court engaged in a "rigorous analysis" in determining that Pellino met the requirements of CR 23. *Oda*, 111 Wn. App. at 93. The trial court concluded that questions of law or fact common to class members predominate and certified the class under CR 23(b)(3). Moreover, CR 23 does not require "that the shared questions of law or fact be identical" as to each individual class member. *Miller*, 115 Wn. App. at 824.[5]

---

[4] (Italics omitted.)

[5] It is unclear whether Brink's is also challenging the predominance requirement under CR 23(b)(3). However, CR 23(b)(3) is satisfied if common questions of law or fact predominate over questions affecting only individual class members, or there is a " 'common nucleus of operative facts' " to each class member's claim. *Smith v. Behr Process Corp.*, 113 Wn. App. 306, 323, 54 P.3d 665 (2002) (internal quotation marks omitted) (quoting *Clark v. Bonded Adjustment Co.*, 204 F.R.D. 662, 666 (E.D. Wash. 2002)).

¶32 We also reject the argument that Pellino's claim was not typical of the class because her breaks varied from those of the class. Typicality is satisfied if the claim " 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.' " *Smith v. Behr Process Corp.*, 113 Wn. App. 306, 320, 54 P.3d 665 (2002)[6] (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996)). The findings establish that Pellino could "establish liability by using representative evidence to prove a pattern or practice of violations by the defendant with respect to the class." And as the trial court noted, "The consistency of the class member testimony regarding the policies and practices at Brink's with respect to rest and meal breaks confirms its representative nature." We conclude the court did not abuse its discretion in certifying the class action or in denying the motion to decertify.

*IWA and WAC 296-126-092*

¶33 Brink's contends the trial court erred in interpreting the requirements of WAC 296-126-092, and concluding that the class members did not receive lawful meal and rest breaks. Brink's also asserts that the court conflated the requirements of working "on-duty" with working "on-call" in concluding that the regulations allowing intermittent rest breaks do not apply, and the court erred in concluding that class members did not waive their right to meal periods and rest breaks.

¶34 Washington State has a "long and proud history of being a pioneer in the protection of employee rights." *Drinkwitz v. Alliant Techsys., Inc.*, 140 Wn.2d 291, 300, 996 P.2d 582 (2000). Remedial statutes protecting employee rights must be liberally construed. *Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett*, 146 Wn.2d 29, 35, 42 P.3d 1265 (2002). In construing the meaning of a provision in a wage statute, chapter 49.48 RCW, the Supreme Court states:

---

[6] (Internal quotation marks omitted.)

A liberal construction requires that the coverage of the statute's provisions "be liberally construed [in favor of the employee] and that its exceptions be narrowly confined." *Peninsula Sch. Dist. No. 401 v. Pub. Sch. Employees*, 130 Wn.2d 401, 407, 924 P.2d 13 (1996).

"When interpreting statutory language, the goal of the court is to carry out the intent of the Legislature." *Ellerman v. Centerpoint Prepress, Inc.*, 143 Wn.2d 514, 519, 22 P.3d 795 (2001). "In ascertaining this intent, the language at issue must be evaluated in the context of the entire statute." *Id.*

*Fire Fighters, Local 46*, 146 Wn.2d at 34-35.[7]

¶35 Under the IWA, all employees shall be "protected from conditions of labor which have a pernicious effect on their health." RCW 49.12.010. The director of the Department of Labor and Industries (DL&I) is responsible for administering and enforcing "all laws respecting the employment and relating to the health, sanitary conditions, surroundings, hours of labor, and wages of employees employed in business and industry." RCW 43.22.270(4). DL&I enacted regulations in chapter 296-126 WAC to protect employee health, safety, and welfare as authorized under chapter 49.12 RCW.

¶36 Brink's challenges the court's interpretation of the language used in WAC 296-126-092(1) that "[e]mployees shall be allowed" meal periods and rest breaks to mean "the employer does have an affirmative obligation to make sure [rest and meal periods] are provided and taken," and class members "never received lawful breaks because they were always engaged in active work duties when on the armored vehicles, specifically, guarding and being vigilant."[8] The trial court's conclusions of law state, in pertinent part:

---

[7] (Alteration in original) (internal quotation marks and citations omitted).

[8] For the first time in the reply brief, Brink's cites *Bobo v. United States*, 37 Fed. Cl. 690 (1997) to argue that vigilance is not work. This court will not review an issue, theory, argument, or claim of error not presented at the trial court level. RAP 2.5(a); *Demelash v. Ross Stores, Inc.*, 105 Wn. App. 508, 527, 20 P.3d 447 (2001). Nonetheless, *Bobo* is distinguishable. In *Bobo*, border agents sought

However, Washington law on rest and meal breaks is clear. Because of the security requirements and scheduling issues involved in these jobs, the class members were always on active duty and never received lawful breaks.

. . . Class members were required by company policy and practice to engage in such work even while eating, going to the bathroom, or making stops to get food or drink. They also were never permitted to enjoy personal activities or make personal choices regarding how to spend their time during any part of their work day, including during such "breaks." The deposition testimony of the managers was quite clear that when class members were out on the vehicles, they were always on duty and always required to be vigilant.

. . . With respect to meal periods, the Court concludes there is no evidence that any truck crew received the required 30 minutes (or more, depending on the duration of the work period) of meal time per class member on either an uninterrupted or intermittent basis. With respect to rest breaks, there also is no evidence that class members received at least ten minutes of uninterrupted break time during the day except on very rare occasions. These rare occasions are not sufficient to undermine the existence of the classwide pattern or practice of failure to receive adequate break time. . . .

. . . Similarly, the fact that drivers and messengers were able to eat while the truck was in motion or that drivers could eat while the messenger was making a pick up or delivery does not mean that they received lawful breaks. As admitted by Brink's own supervisors, class members were required to and did continue performing their jobs during these times, even while they were eating or drinking. . . .

---

compensation for being "vigilant" during the commute to and from work, which meant turning on the border patrol radio and keeping a lookout for immigration infractions. *Bobo*, 37 Fed. Cl. at 699-700. The court concluded the border agent's interpretation would mean they are "essentially 'on-duty' 24 hours a day." *Bobo*, 37 Fed. Cl. at 699-700. Unlike in *Bobo*, the court found that "[t]he vigilance required of class members is not a passive state but requires active observation and mental exertion at all times." Federal courts have long held that " '[w]ork' . . . is 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer.' " *Alvarez v. IBP, Inc.*, 339 F.3d 894, 902 (9th Cir. 2003) (quoting *Tenn. Coal, Iron & R.R. v. Muscoda Local No. 123*, 321 U.S. 590, 598, 64 S. Ct. 698, 88 L. Ed. 949 (1944)).

. . . Brink's had actual or constructive knowledge that the class members were not receiving lawfully adequate breaks and therefore may be held liable for the missed time. . . . Brink's established the work rules requiring constant guarding and vigilance and made no effort to arrange conditions under which class members working on the armored vehicles could be relieved from work, rest, relax, and take true breaks. Brink's also instructed crew members in training that they should eat while on the go and could not stop the truck to take breaks and reinforced this practice through monitoring of the trucks and urging crews to hurry up and keep the trucks moving.

¶37 Brink's contends that an employer does not have a duty to "provide" meal and rest breaks but is required only to allow employees to take meal periods and rest breaks by not "stand[ing] in the way of employees who choose to take breaks." Brink's also contends that an employer does not have a duty to ensure employees take meal and rest breaks under WAC 296-126-092. WAC 296-126-092 states, in pertinent part:

(1) Employees shall be allowed a meal period of at least thirty minutes which commences no less than two hours nor more than five hours from the beginning of the shift. Meal periods shall be on the employer's time when the employee is required by the employer to remain on duty on the premises or at a prescribed work site in the interest of the employer.

(2) No employee shall be required to work more than five consecutive hours without a meal period.

. . . .

(4) Employees shall be allowed a rest period of not less than ten minutes, on the employer's time, for each four hours of working time. Rest periods shall be scheduled as near as possible to the midpoint of the work period. No employee shall be required to work more than three hours without a rest period.

(5) Where the nature of the work allows employees to take intermittent rest periods equivalent to ten minutes for each 4 hours worked, scheduled rest periods are not required.

¶38 The plain language of WAC 296-126-092 imposes a mandatory obligation on the employer. WAC 296-126-092(1) states that employees "shall be allowed a meal period of at least thirty minutes" and when the employer requires the employee to remain "on duty," the "[m]eal periods shall be on the employer's time." WAC 296-126-092(2) also states that "[n]o employee shall be required to work more than five consecutive hours without a meal period." In addressing rest breaks, the plain language of WAC 296-126-092(4) states that "[e]mployees shall be allowed a rest period of not less than ten minutes, on the employer's time, for each four hours of working time," and describes when rest periods "shall be scheduled."

¶39 The administrative policy issued by DL&I interpreting WAC 296-126-092 supports our conclusion. An agency's interpretation of law is entitled to deference "to the extent that it falls within the agency's expertise in a special area of the law." *Plum Creek Timber Co. v. State Forest Practices Appeals Bd.*, 99 Wn. App. 579, 588, 993 P.2d 287 (2000). Administrative Policy ES.C.6 makes clear that employers have a duty to provide meal periods and rest breaks and to ensure the breaks comply with the requirements of WAC 296-126-092.[9]

¶40 With respect to meal periods, ES.C.6, section 7 states, in pertinent part, that if an employee is required to remain on duty during meal periods, "the employer must make every effort to provide employees with an uninterrupted meal period." And if the meal break is interrupted, the meal period is continued until the employee "has received 30 minutes total of mealtime." ES.C.6, section 7 states, in pertinent part:

**7. When must the meal period be paid?**

Meal periods are considered hours of work when the employer requires employees to remain on duty on the premises or at a

---

[9] Administrative Policy ES.C.6 was originally issued in 2002 and revised in 2005.

prescribed work site *and* requires the employee to act in the interest of the employer.

When employees are required to remain on duty on the premises or at a prescribed work site and act in the interest of the employer, the employer must make every effort to provide employees with an uninterrupted meal period. If the meal period should be interrupted due to the employee's performing a task, upon completion of the task, the meal period will be continued until the employee has received 30 minutes total of mealtime. Time spent performing the task is not considered part of the meal period. The entire meal period must be paid without regard to the number of interruptions.

Wash. Dep't of Labor & Indus., Administrative Policy ES.C.6, § 7, at 3-4 (rev. June 24, 2005).

¶41 ES.C.6, section 7 also states:

As long as the employer pays the employees during a meal period in this circumstance and otherwise complies with the provisions of WAC 296-126-092, there is no violation of this law, and payment of an extra 30-minute meal break is not required.

Administrative Policy ES.C.6, § 7, at 4.

¶42 Administrative Policy ES.C.6 defines "rest period" as a break that allows the employee to stop work duties or activities for "personal rest and relaxation." Administrative Policy ES.C.6, section 10 states:

**10. What is a rest period?**

The term "rest period" means to stop work duties, exertions, or activities for personal rest and relaxation. Rest periods are considered hours worked. Nothing in this regulation prohibits an employer from requiring employees to remain on the premises during their rest periods. The term "on the employer's time" is considered to mean that the employer is responsible for paying the employee for the time spent on a rest period.

¶43 Accordingly, if an employee is on duty, the paid meal period or rest break may be interrupted, but the employee is entitled to a full 30 minutes of paid meal time and a full 10 minutes for a rest break without performing work duties on behalf of the employer.

¶44 In *Wingert v. Yellow Freight Systems, Inc.*, 146 Wn.2d 841, 50 P.3d 256 (2002), the Washington Supreme Court addressed the meaning of the language used in WAC 296-126-092(4) for rest breaks. The court interpreted the language used in WAC 296-126-092(4) to " 'clearly and unambiguously prohibit[ ] working employees for longer than three consecutive hours without a rest period.' " *Wingert*, 146 Wn.2d at 848.[10] The court held that "Yellow Freight did not comply with WAC 296-126-092(4) when it failed to provide paid rest periods to employees." *Wingert*, 146 Wn.2d at 848. The court further held that because Yellow Freight did not comply with the requirements for rest breaks, the employee's workday was extended by 10 minutes, the employer received an additional 10 minutes of labor, and the employees were entitled to compensation for that time. *Wingert*, 146 Wn.2d at 849.

¶45 Brink's asserts that *Wingert* does not apply because the court did not address meal periods. We conclude *Wingert* applies with equal force to the requirement that on-duty employees "shall be allowed" a total of 30 minutes for a meal period without engaging in work activities. Under ES.C.6, section 7, the failure to provide the armored truck crews with 30 minutes of total meal time while on duty violates WAC 296-126-092.

> If the meal period should be interrupted due to the employee's performing a task, upon completion of the task, the meal period will be continued until the employee has received 30 minutes total of mealtime. Time spent performing the task is not considered part of the meal period. The entire meal period must be paid without regard to the number of interruptions.

Administrative Policy ES.C.6, § 7, at 3-4.

¶46 Here, the court did not err in ruling that Brink's had a duty to provide the driver and messenger with meal periods and break times. The unchallenged findings of fact

---

[10] (Quoting *Wingert v. Yellow Freight Sys.*, 104 Wn. App. 583, 588, 13 P.3d 677 (2000).)

support the trial court's conclusion that because the messengers and drivers were always engaged in work duties, they did not receive lawful breaks that complied with WAC 296-126-092. The unchallenged findings also support the court's conclusion that even if the crew received breaks, the drivers and messengers did not have sufficient time to take the meal and rest breaks as required by WAC 296-126-092.

¶47 Brink's reliance on *White v. Salvation Army*, 118 Wn. App. 272, 75 P.3d 990 (2003), to argue that an employer has no duty to ensure that employees take meal periods and rest breaks is misplaced. In *White*, we addressed the question of whether requiring employees to be on call during meal and rest breaks violated WAC 296-126-092. We held that while an employer does not have an obligation to schedule meal periods or rest breaks under WAC 296-126--092, the employer must provide breaks that comply with the requirement of "relief from work or exertion." *White*, 118 Wn. App. at 283.

First, meal and rest periods are treated substantially the same by DL[&]I. The specific requirements for each are listed under the same regulation, WAC 296-126-092. Subject to certain exceptions limited to meal periods, employers are required to pay workers for both of these periods. Minimum time periods for each are set forth in the regulation. And the regulations set times, subject to certain exceptions, when each type of period must occur during the workday.

Second, the underlying purpose for meal periods and rest periods—to provide relief to employees from "work or exertion"—is the same for both. The regulation expressly contemplates that an employer may require a worker to act in the interest of the employer during meal periods, provided the worker is paid for that time. We see no persuasive basis for distinguishing between permitting a worker to act in the interest of an employer during meal periods and doing so during rest periods, provided the employee is paid and provided further the underlying purpose of the rest period—relief from work or exertion—is not compromised. Being on call in this case fits these criteria.

*White*, 118 Wn. App. at 283. Here, unlike in *White*, the unchallenged findings support the court's conclusion that the drivers and messengers did not receive meal periods or rest breaks that allowed "relief from work or exertion." *White*, 118 Wn. App. at 283.

¶48 Next, Brink's asserts that because it paid the drivers and messengers to remain on duty during meal periods and rest breaks, WAC 296-126-092 allowed the crew to work during the paid breaks. Brink's argues that the trial court erred in concluding that "no active work can be performed" during a paid meal period and conflated an "on duty" paid meal break with the requirements for an employee "on call."

¶49 WAC 296-126-092(1) allows paid meal breaks where an employer requires an employee to "remain on duty on the premises or at a prescribed work site" and requires the employee to act "in the interest of the employer." However, as emphasized in *White* and in ES.C.6, section 7, paid breaks must provide relief from work or exertion. *White*, 118 Wn. App. at 283.

¶50 As with an on-duty meal break, if the employee is called on to engage in a work activity during an on-call rest break, time spent engaged in work activity does not count. Administrative Policy ES.C.6, § 13, at 5. ES.C.6, section 13 states:

> In certain circumstances, employers may have a business need to require employees to remain on call during their paid rest periods. This is allowable provided the underlying purpose of the rest period is not compromised. This means that employees must be allowed to rest, eat a snack or drink a beverage, make personal telephone calls, attend to personal business, close their door to indicate they are taking a break, or make other personal choices as to how they spend their time during their rest break.

Administrative Policy ES.C.6, § 13, at 5.

¶51 Consequently, during on-duty meal breaks and on-call rest breaks, the employer may require the employee to

act in the employer's interest, but when the employee must engage in work activity, that time does not count towards the break. The trial court correctly rejected the argument that if an employer pays an employee to remain "on duty," under WAC 296-126-092 there are no limitations to requiring the employee to engage in work activities during breaks.

> Brink's contends that since the law permits employees to be "on duty" during paid meal periods, there is, in essence, no limit to the amount of active work that can be required. The Court concludes this position is incorrect. While an "on duty" employee may be "on call" and required to remain "on the premises" during a paid meal or rest period, he or she cannot be required to carry out active work activities. It is not possible to both perform active work duties and at the same time to stop work duties for rest and relaxation, which is the underlying purpose for both rest and meal periods. *See* DL&I Policy ES.C.6; *White*, 118 Wn. App. at 283 (the "underlying purpose for meal periods and rest periods -- to provide relief to employees from 'work or exertion' -- is the same for both.") As the Court of Appeals explained in *Frese v. Snohomish County*, 129 Wn. App. 659, 666, 120 P.3d 89 (2005), an employer cannot "demand unremitting work through the [paid] lunch period."
>
> . . . In summary, neither paid rest breaks nor paid meal periods have to be scheduled (although the employer should make some effort to do so), the breaks can be interrupted (within reasonable limits), and employees may be required to remain "on duty" on the employer's premises during the breaks. However, this "on duty" responsibility is limited to being "on call;" no active work can be performed, and the employees must be able to engage in personal activities and rest during these breaks. And, the full amount of required time (*i.e.*, 10 minutes rest break for each 4 hours, and 30 minutes meal period for each 5 hours) must be provided.

¶52 Brink's reliance on *White* and *Iverson v. Snohomish County*, 117 Wn. App. 618, 72 P.3d 772 (2003) is misplaced. In *White*, unlike here, while the domestic violence counselors "were required to remain on call and available to

respond to telephone calls and resident needs at all times during their shift, they did have time during which they could rest, eat, or attend to personal matters." *White*, 118 Wn. App. at 275.

> The record here provides an excellent example of why being on call is not inconsistent with being relieved from one's normal work duties. Workers on the graveyard shift were permitted to sleep. Workers on all shifts were also allowed to eat, rest, make personal telephone calls, attend to personal business that would not take them away from the facility, and close the door to the office in order to make themselves unavailable.

*White*, 118 Wn. App. at 283-84. We held that requiring the domestic violence counselors to remain on call did not violate WAC 296-126-092 because the counselors were not engaged in work-related activities. *White*, 118 Wn. App. at 274-75.

¶53 By contrast, the trial court's unchallenged findings in this case establish that Brink's drivers and messengers were always engaged in work activities and even if the crews had the opportunity to take breaks, there was insufficient time. Unlike in *White*, crew members were also strictly prohibited from using "distracting materials" or engaging in any personal activities.

¶54 In *Iverson*, a custody officer sued his employer alleging that the requirement to be on call during a meal period did not "reflect the reality of the extensive duties that he is required to perform during his lunch period." *Iverson*, 117 Wn. App. at 622. We affirmed summary judgment dismissal of the lawsuit because the custody officer presented no evidence as to the amount of time he spent performing work duties, and the only evidence in the record showed that "the work requirements do not take up more than 10 percent of the lunch period for a custody officer." *Iverson*, 117 Wn. App. at 622. Unlike in *Iverson*, the evidence and unchallenged findings establish that messengers and drivers were constantly engaged in work activities

while working on the routes and guarding the armored truck.

¶55 This case is more like *Frese*. In *Frese*, the employer agreed to pay corrections officers to be "on call" during the 30-minute lunch break. *Frese*, 129 Wn. App. at 661. But the employer required the corrections officers to supervise up to 79 inmates while eating lunch. *Frese*, 129 Wn. App. at 664. The corrections officers sued, alleging the employer required them to work through the entire meal period without a break from work responsibilities as required by WAC 296-126-092. *Frese*, 129 Wn. App. at 662. We distinguished *Iverson* and held that the agreement to be "on call" during a paid lunch period does not make it "permissible for the employer to demand unremitting work through the lunch period." *Frese*, 129 Wn. App. at 665-66.[11]

> Here, in contrast to the evidence described in *Iverson*, declarations from corrections officers provide detailed evidence of the reality of their lunch period. Modules housing up to 79 inmates in the main jail are assigned one corrections officer, while those housing over 80 inmates are assigned two officers. The officers are required to eat in modules with inmates, and they say there is no letup in their responsibility for supervision during the meal period. In fact, one officer says meal times actually increase his duties because of the added potential for inmate disturbances. Declarants say the only time they can rest is during their 15 minute rest breaks. Without a break for lunch, sometimes this means working as long as five hours without rest. One officer who works in the central control tower is responsible for controlling all the facility's secured doors. He says there are never more than a few minutes between requests to open doors. "Some days, it will take several hours when I take a bite of a sandwich in between telephone calls, in between radio calls, in between opening doors." According to lead plaintiff Eva Frese, it is "not a question of being on call

---

[11] Because there were material issues of fact as to whether the corrections officers were denied all or part of their meal breaks, we denied plaintiffs' cross motion for summary judgment. *Frese*, 129 Wn. App. at 670-71.

during the lunch break; the fact is that I continue to work as if there were no break at all."

*Frese*, 129 Wn. App. at 664.[12]

¶56 Brink's contends the trial court erred in concluding that the drivers and messengers did not receive intermittent rest breaks. WAC 296-126-092(5) states that "[w]here the nature of the work allows employees to take intermittent rest periods equivalent to ten minutes for each 4 hours worked, scheduled rest periods are not required."

> An "intermittent rest period" is defined as intervals of short duration in which employees are allowed to relax and rest, or for brief personal inactivities from work or exertion. A series of ten one-minute breaks is not sufficient to meet the intermittent rest break requirement. The nature of the work on a production line when employees are engaged in continuous activities, for example, does not allow for intermittent rest periods. In this circumstance, employees must be given a full ten-minute rest period.

Administrative Policy ES.C.6, § 12, at 5.

¶57 The unchallenged findings support the trial court's determination that the short breaks the crew took during the day did not qualify as intermittent breaks.

> Although class members were able to make brief stops to run to the restroom or to grab food or drink to consume on the truck, the Court concludes that such brief stops are too short and hurried to rise to the level of "intermittent breaks." These stops did not provide a true break from work activity and opportunity for relaxation and therefore do not qualify as break time under the DL&I regulation and interpretive guidance.

¶58 Brink's also asserts that the trial court erred in concluding there was no evidence class members waived their right to meal periods or rest breaks. Brink's bears the burden of proof on the affirmative defense of waiver. *Jones v. Best*, 134 Wn.2d 232, 241-42, 950 P.2d 1 (1998). A waiver

[12] (Footnotes omitted.)

is the intentional and voluntary relinquishment of a known right. *Jones*, 134 Wn.2d at 241. It may result from an express agreement or be inferred from circumstances indicating an intent to waive. *Bowman v. Webster*, 44 Wn.2d 667, 669, 269 P.2d 960 (1954). To constitute implied waiver, there must exist unequivocal acts or conduct evidencing an intent to waive; waiver will not be inferred from doubtful or ambiguous factors. *Cent. Wash. Bank v. Mendelson-Zeller, Inc.*, 113 Wn.2d 346, 354, 779 P.2d 697 (1989). Employees can waive the meal break requirements but may not waive the right to a rest break. Administrative Policy ES.C.6, §§ 8, 9, at 4.

¶59 The trial court found that "[t]here is no evidence in this case to support the conclusion that class members willingly and voluntarily waived their meal breaks, and there is evidence to the contrary from former branch managers."[13] The unchallenged findings support the trial court's conclusion that Brink's did not carry its burden of establishing waiver.

> The Court rejects Brink's argument that class members waived their breaks. Rest breaks cannot be waived under Washington law. *See* DL&I Policy ES.C.6. Meal periods can be waived, but only if the waiver is knowing and voluntary. Waiver is an affirmative defense on which defendant bears the burden of proof. *Jones*[ ], 134 Wn.2d [at] 241-42 . . . . There is no evidence in this case to support the conclusion that class members willingly and voluntarily waived their meal breaks, and there is evidence to the contrary from former branch managers.

*Expert Testimony*

¶60 Brink's contends the trial court erred in relying on the expert testimony of Dr. Abbott and Dr. Munson.

¶61 ER 702 permits expert testimony where "scientific, technical, or other specialized knowledge will assist

---

[13] Brink's managers testified that crew members did not expressly waive their breaks.

the trier of fact to understand the evidence or to determine a fact in issue." The trial court has broad discretion in ruling on the admissibility of expert testimony. *Philippides v. Bernard*, 151 Wn.2d 376, 393, 88 P.3d 939 (2004). We will not disturb the trial court's ruling " '[i]f the reasons for admitting or excluding the opinion evidence are "fairly debatable." ' " *Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue*, 106 Wn.2d 391, 398, 722 P.2d 787 (1986) (quoting *Walker v. Bangs*, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979)).

¶62 Brink's asserts Dr. Abbott's testimony regarding the Daily Guide Sheets was "flawed" because he assumed that crew members "never took breaks unless they noted them on the Guide Sheet." We disagree.

¶63 The unchallenged findings refute the premise of Brink's argument that unless otherwise noted, the analysis assumed crews never took breaks. The court found "the absence of recorded restroom stops or stops to grab food or drink on most of the guide sheets does not necessarily mean that such stops were not made." The court found that "the overwhelming absence of recorded meal breaks on the guide sheets and the short duration of the few meal breaks that were recorded corroborates the class member testimony that class members did not receive meal breaks." The court also notes that "Brink's has not pointed to any significant errors" in the summaries Dr. Abbott prepared, and found the summaries set forth in the exhibits were reliable.

¶64 Brink's also challenges the trial court's reliance on the testimony of Dr. Munson. Brink's claims the methodology used by Dr. Munson in calculating damages is unreliable.

¶65 Damages need not be proved with mathematical certainty, but must be supported by evidence that provides a reasonable basis for estimating the loss and does not amount to mere speculation or conjecture. *Shinn v. Thrust IV, Inc.*, 56 Wn. App. 827, 840, 786 P.2d 285 (1990).

¶66 The trial court ruled that Dr. Munson's testimony established a reasonable basis to award back pay

damages for violation of WAC 296-126-092. Dr. Munson used timecard punch data and payroll information produced by Brink's to calculate the total time class members worked each day. Dr. Munson then calculated the time for meal and rest breaks the class members should have received.[14] If data for a particular day was not available, Dr. Munson applied a class-wide average to determine hours and break time. After finding that Dr. Munson's calculations overstated the amounts owed for some class members who at times worked out of state or in job categories other than driver or messenger, the trial court reduced the damages award for those crew members. The record supports the trial court's finding that "Dr. Munson's overall methodology for calculating damages is sound and reasonable."

¶67 Brink's argues that the time crew members spent before and after going out on the daily routes should not be included in the calculation of damages because "the evidence was undisputed that employees *did* take breaks at the Branch." But the unchallenged findings state that work performed at the branch before and after runs "is inherently connected to work on the armored vehicle runs and there is no evidence that employees received break time during these work activities or between these work activities and the actual run." The trial court did not abuse its discretion by relying on the testimony of Dr. Munson.[15]

¶68 We affirm the trial court's determination that drivers and messengers did not receive lawful meal periods and rest breaks and entry of the judgment in favor of the class members. Upon compliance with RAP 18.1, based on RCW

---

[14] Brink's did not produce punch data for every class member and the data did not include the first two months of the class period.

[15] Brink's also contends that the expert's testimony is not reliable because punch data was manipulated by counsel for the class before being submitted to Dr. Munson. But the record shows that Brink's produced the "total amount" data in discovery.

49.46.090 and RCW 49.48.030, the class is entitled to an award of reasonable attorney fees on appeal.

Cox and Lau, JJ., concur.